EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

v.

NORTH HILLS PASSAVANT HOSPITAL, Defendant.

Civ. A. No. 75–890.

United States District Court,
W. D. Pennsylvania.

Feb. 26, 1979.

Ruth Weyand, EEOC Regional Litigation Office, Philadelphia, Pa., for plaintiff.

Edward N. Stoner, III, and C. Arthur Dimond, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for defendant.

## OPINION

SNYDER, District Judge.

The Equal Employment Opportunity Commission (EEOC) brought action alleging that North Hills Passavant Hospital (the Hospital) engaged in racially discriminatory hiring and job classification practices. Later, similar discrimination claims in recruitment and job assignment policies were added. The Hospital's Motion for Summary Judgment was granted by the late Judge Gourley of this Court;[1] this determination was reversed by the Third Circuit Court of Appeals,[2] and the matter was remanded to us for trial. The case was bifurcated as to liability and damages in a trial to the court. Our findings of fact and conclusions of law on the issue of liability follow, pursuant to Rule 52 of the Federal Rules of Civil Procedure. Finding no discriminatory practices by the Hospital, judgment will be entered in its favor.

[1.] Judge Gourley granted the Defendant's Motion holding (1) that the EEOC must intervene to assert a claim once a private party properly institutes action; (2) that the action was time barred and for laches; (3) EEOC failed to follow the Court's request to involve itself in settlement negotiations.

[2.] The Circuit Court of Appeals, 544 F.2d 664 (3rd Cir. 1976) reversed on all findings, holding in substance that the EEOC was not barred from filing independent civil action on behalf of the public interest once private suit involving the same charge had been filed.

## I. FINDINGS OF FACT

The EEOC is a federal agency established by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and came into existence on July 2, 1965. The Hospital, a Pennsylvania corporation, is a non-profit, non-sectarian general hospital located in Allegheny County, Pennsylvania, approximately 14 miles north of the City of Pittsburgh.

This action resulted from charges filed by Arthur W. Pope on January 18, 1972, with the Pittsburgh Office of the EEOC.[3] These charges were referred to the Pennsylvania Human Relations Commission for a period of 60 days. A "right to sue" letter was eventually issued by the EEOC, and Pope brought an individual action, which was later settled. However, EEOC continued with its own action, the instant matter.

Relocation of the Hospital was completed in 1964, from a predominately Black area to a predominately White area, and it is necessary that we briefly outline that change.

## A. HISTORY OF THE HOSPITAL

The Hospital, then the Pittsburgh Infirmary, was officially opened in 1849 at a site north of the Allegheny River (then Allegheny City) by the Reverend Doctor William Passavant, a Minister of the Evangelical Lutheran Church. It was the first Protestant hospital established in America. During a cholera epidemic that year, the Infirmary was moved about a mile to a section of the City of Pittsburgh known as Laceyville, now known as the Hill District, to be staffed by German Protestant Deaconesses, and dedicated "[I]n order that the sick and suffering might be cared for in a becoming and Christian manner without distinction of color, creed, or country." When money became scarce, the Infirmary closed in 1887, and reopened in 1893, on its fifteenth anniversary. A new building was dedicated in 1899 and the name was changed to Passavant Hospital, in honor of Dr. Passavant, who had died five years earlier. By 1924, the Hill District, once considered "in the country", was now in the heart of one of the most populated areas of the City. Passavant Hospital was reincorporated in 1926 as a non-sectarian institution and qualified for state aid.

Trouble was not long in appearing, for, as early as 1947, Dr. Abraham Osserof, Executive Director of the Area Hospital Council, told Passavant Hospital that "[a]s a general hospital in the Hill District IT IS NOT NEEDED." By the early 1950's, Passavant Hospital was in dire financial condition as it could not meet operating expenses. The physical condition had deteriorated over the many years of service, and in later years it was operated partly as a hospital and partly as a nursing home facility. Prior to 1956, unofficial groups attempted to raise funds for a new or renovated building at the Hill District site, but were not successful. During this period, the number of available beds at the Hospital was reduced from 180 to 110; even so, the percentage of bed occupancy dropped to 55-65%. A Long-Range Planning Committee was appointed in 1956 to consider these problems, and consulted Dr. Robert M. Moore, Vice Chancellor of the School of Health Professions, University of Pittsburgh. Dr. Moore advised them not to renovate or add to the present plant, and, from what he knew of the area, recommended a move to a suburban site after first surveying Allegheny County for areas of greatest need of hospital facilities. The Board of Directors voted to relocate the Hospital on December 20, 1956, and the Corporate Board then voted for relocation on January 17, 1957; the area of such relocation was undesignated at the time.

It is clear to the Court that if the Hospital had not relocated, it would have been forced to close, at least as a general hospital; this was the opinion of its Staff and Board, because of (1) low percentage of bed

---

**3.** The charge alleged the Hospital denied Pope employment because of his race, Negro, and was "discriminating against Negroes as a class", in violation of Title VII. The lawsuit, by stipulation, "is not jurisdictionally premised on any charge other than the charge of Arthur W. Pope."

occupancy, and (2) increasing operating losses. We do not overlook the fact that beginning in 1929, and continuing into the mid-1950s, the decline in usage of facilities may well have been strongly influenced by the lack of Black doctors on the Hospital's Staff who did not have their own Black patients from the Hill District, or elsewhere. The testimony is singularly devoid, however, of proof that any change in this situation would have stemmed the declining financial condition of the Hospital so that relocation would have been made unnecessary. The same may be said of the declining attendance at the Hospital's School of Nursing "decreasing because of [its] location". No one condones these situations, but we are here looking at the necessity of relocation, and the EEOC does not contest this necessity if the Hospital was to survive. We find that race was not a factor in the determination that relocation was a necessity.

## B. THE RELOCATION PROCESS

Four possible sites for a new facility were considered and rejected for the reasons asserted: (1) An old Municipal Hospital in the Hill District proved to be unavailable; (2) A site in Whitehall was too small, was located near three other hospitals, and the authority of the woman offering to donate it was doubtful; (3) The United Lutheran Church's Home for the Care of the Aging in Zelienople did not prove useful because there was no need for a hospital in the area; and (4) A site in Monroeville was too near to the Columbia Hospital, and there was no strong community support indicated.

The Committee found that there was a need for a hospital in the North Hills, and there was active community support by the residents of the area, 16,000 of whom signed a petition and formed the North Hills Hospital Association for ongoing support. The Board of Directors decided on the North Hills location on January 30, 1958, and determined that there should be a review of the area. Dr. John R. McGibony, a Professor of Hospital and Medical Administration of the University of Pittsburgh's School of Public Health, was employed to review the present facility and the need for a hospital in the area north of the Allegheny River. He concluded that the Hospital's existing plant, which had some areas which were 100 years old and with major hazards, was inadequate, and that it would be illogical to rebuild in the Hill District because of the redevelopment planned for the area and because of the nearby available hospitals. He advised that a hospital was needed in the North Hills because of explosive population growth (some 78% between 1930 and 1957), the low number of doctors practicing in the area, although 115 resided there, and the strong interest of the residents in acquiring a hospital. The only negative factor he found was an absence of "large givers" in this middle class suburban area. He then recommended the Hospital proceed with plans for a 200 bed hospital in the North Hills, for in applying an accepted formula of four general beds per 1,000 population there was a need of 368 additional beds. Dr. McGibony found it very important, as do we, that:

"Passavant has a strong on-going organization, with a long history of service and 'know how', and this organization is being strengthened even more."

A second study was done by the firm of Norby and Hatfield, commissioned by the Board on the recommendation of the Hospital Planning Association, an organization composed largely of corporate contributors to hospital expansion, which confirmed Dr. McGibony's conclusions.

The present site of the Hospital, forty-two acres on Babcock Boulevard in the North Hills, was donated in 1959. Hill-Burton funds were obtained from the Federal Government, and $1,300,000 was raised by the Hospital, mainly from small contributors in the North Hills, and a million dollars was borrowed from a bank. We conclude that none of these funds would have been available to rebuild the Hospital at the old site in the Hill District. Construction of the new building was begun September 25, 1962, dedicated February 24, 1964, and renamed the North Hills Passavant Hospital on June 26, 1964.

One section of the Hill District facility remained open as a Nursing and Convalescent Residence. It proved not to be self-supporting and became a financial drain on the Hospital. It was closed in September 1969, because of financial reasons and because it did not appear to be meeting a proven need.[4] Race was not a factor in this closing.

## C. EMPLOYMENT AT THE NEW FACILITY

Alexander McAliley, Executive Director of the Hospital, and Virginia Lang, Director of Nursing, met with all the employees during 1963 and 1964, and offered them the option of moving to the new facility in the North Hills, or remaining at the Convalescent Residence. They were told they would have priority over new applicants for positions at the new location. All employees who wanted to work at North Hills were hired, except one White woman.

When the Residence was preparing to close, a circular, dated August 26, 1969, was distributed to the employees announcing the closing and advising them of meetings scheduled for all who wanted to be considered for employment at the North Hills Hospital. The circular stated, "Every effort will be made to provide employment for those individuals who desire it at North Hills Passavant Hospital, provided suitable vacancies exist." Meetings were held by the Assistant Administrator, Virginia Thomas, and the Personnel Director, Ruth G. Hough, and the administration made a strong effort to find a new position for each of the employees, either at North Hills or at other hospitals and nursing homes. The difficulty in commuting and the lack of public transportation to the North Hills facility was a problem for many of the Residence employees, and there were available positions in other hospitals in the City. No Residence employee who applied for employment at North Hills was rejected.

Three-fourths of the student nurses enrolled at the Hospital's School for Licensed Practical Nurses continued to live at the Nurse's Residence at the old site. They travelled by school bus to the new site each morning and returned to the Residence at night until 1968, when a residential building was completed in the North Hills within walking distance of the Hospital. In 1973, the School was absorbed by the Community College of Allegheny County. No transportation was offered employees as such.

## D. THE STATISTICAL APPROACH

In the years 1947 to 1964, before the move to North Hills, the Hospital had 50 to 60 Black employees, constituting 30–40% of its total work force. The racial composition of the Hospital's work force from 1966 to 1969, while it was operating in both the North Hills and the Hill District, was:

|      | Total Employees | Blacks | % Black |
|------|-----------------|--------|---------|
| 1966 | 424             | 78     | 18.4    |
| 1967 | 479             | 80     | 16.7    |
| 1968 | 496             | 76     | 15.3    |
| 1969 | 536             | 87     | 16.2    |

The racial composition after closing the Convalescent Residence was:

|      | Total Employees | Blacks | % Black |
|------|-----------------|--------|---------|
| 1970 | 488             | 12     | 2.5     |
| 1971 | 503             | 11     | 2.2     |
| 1972 | 548             | 9      | 1.6     |
| 1973 | 708             | 9      | 1.3     |
| 1974 | 740             | 10     | 1.4     |
| 1975 | 795             | 10     | 1.3     |
| 1976 | 816             | 10     | 1.2     |
| 1977 | 911             | 7      | .8      |

## E. HIRING PRACTICES

The EEOC contends that staffing the new facility was done by requiring certain personnel to live within walking distance of the Hospital, an area which was 99% White, and generally giving preference in employment to persons living within a 20 minute travel time, all racially significant.

The "Primary Service Area" of the Hospital includes in Allegheny County, Mar-

4. The Laceyville-Hill District site was redeveloped into modular apartments in the early 1970s by the Urban Redevelopment Authority.

shall, Pine, Richland and Hampton Townships, most of McCandless, and parts of Franklin Park, Ross and Shaler Townships, and, in Butler County, Cranberry Township, most of Jackson, and parts of Adams and Forward Townships.

The following table compares the number of Blacks who work at the Hospital and live in the three major areas contributing employees to the Hospital and the percentage of Blacks in the work forces of those areas. It also shows the "observed significance level" of the differences as equated by Dr. John P. Lehoczky (Defendant's Expert), Associate Professor, Department of Statistics, Carnegie Mellon University:

| Geographical Regions | Percent Black | No. of Employees | Expected Blacks | Observed Blacks | Observed Significance Level |
|---|---|---|---|---|---|
| Primary Service Area | 0.35% | 704 | 2.46 | 2 | .546 |
| City of Pittsburgh | 17.5% | 53 | 9.33 | 5 | .084 |
| Other Allegheny County (except McKeesport) | 0.9% | 93 | .84 | 1 | .796 |

In March 1975, the Hospital's Personnel Office began marking the race of applicants for employment who applied in person, or otherwise indicated race, on their applications. During the period March 1975 to June 1978, the Hospital received nearly 5,200 applications. The race of slightly more than 3,000 of these is identifiable, and, of course, only eight were Black. Thus, Blacks constituted only .3% of the applicants whose race was identifiable, and only .2% of the total applicants. Both figures reflect a lower percentage than the percentage of Blacks employed during this period.

The distribution of present employees at the Hospital, closely parallels the distribution of applications for employment received from each of the indicated areas, between March 1975 and June 1978:

| Geographical Region | Employed at the Hospital | Applicants |
|---|---|---|
| Primary Service Area | 79.9% | 77.8% |
| Pittsburgh (South of Allegheny, North of Monongahela) | 1.9% | 3.9% |
| Allegheny County (South of Monongahela-Ohio River) | 1.8% | 2.5% |
| Other | 16.4% | 15.8% |

(Applications received from locations beyond reasonable commuting distances, e. g. Erie, Harrisburg, Philadelphia, and State College, Pennsylvania were excluded from consideration.)

When an individual applied for work at the new facility, the Personnel Office would review the application and determine whether there was any suitable opening. If so, the application would be sent to the head of the department where the opening existed. If no position was presently open, the applicant was told he would be called if anything became available, and his application was filed under the appropriate position category. When an opening occurred, the department head generally asked to see the applications on file. The Personnel Office screened the applications and only sent those that appeared to meet the minimum qualifications in terms of education and job experience to the department head. If there was a doubt as to qualifications, the Personnel Office would sometimes forward the applications to the department head to make the determination on the qualifications of the applicant. References were checked by the Personnel Office, and arrangements were also made for interviews with the head of the hiring department. Applications were filed chronologically, the more recent being more readily available than the older ones because the recent applicants were less likely to have obtained other employment by the time vacancies occurred. Race was not a factor.

The Hospital relies mainly on unsolicited applications to fill job vacancies, and has done very little advertising to recruit em-

ployees. During the years 1970 through 1974, the Hospital spent the following amounts for advertising:

| | |
|---|---|
| 1970 | $ 421.69 |
| 1971 | $ 484.45 |
| 1972 | $ 756.50 |
| 1973 | $1,362.75 |
| 1974 | $1,855.77 |

When the Hospital did advertise for job applicants, it placed ads in newspapers of general circulation, including the Pittsburgh Press, which is circulated in both Black and integrated communities in and around the City of Pittsburgh.

Occasionally the Hospital sought employees through schools, such as Allegheny Community College, Duquesne University, and the Pittsburgh Public Schools, and also through the Pennsylvania Bureau of Employment Security. No evidence of discriminatory practices on the part of any of the institutions or services used in such recruiting was introduced at trial.

5. Route 11A, which services the Hospital, has been operated by PAT for some time prior to January 1, 1970. Throughout the period January 1, 1970 to the present time, the ordinary running time on Route 11A from Downtown Pittsburgh to the Hospital has been approximately 30 to 36 minutes, to reach the Hospital by 7:30 A.M. on weekdays and Saturdays, and approximately 40 to 45 minutes to reach the Hospital by 3:30 P.M. on weekdays and Saturdays. Throughout this same period, the running time on Route 11A from the Hospital to Downtown has been approximately 40 to 45 minutes, leaving both at 7:00 A.M. and 3:30 P.M. on weekdays and Saturdays. In addition, during the period, PAT has not consistently offered Route 11A service to the Hospital.

Beginning in November 1974, PAT commenced service to the Hospital on Route 11C. Throughout the period November 1974 to the present, the ordinary running time on weekdays between Downtown Pittsburgh and the Hospital has been approximately 45 minutes, to arrive at the Hospital by 7:45 A.M., approximately 70 minutes by 3:30 P.M., and approximately 55 to 60 minutes by 11:00 P.M. Also, during the same period, the ordinary running time on Route 11C from the Hospital to Downtown Pittsburgh has been approximately 50 minutes when leaving at 7:00 A.M., and approximately 45 minutes when leaving at 3:30 P.M. At no time during this period has PAT

Approximately 20% of the Hospital's employees work a 8:00 A.M. to 4:30 P.M. or a 8:30 A.M. to 5:00 P.M. shift, and most of the Housekeeping Department personnel work 7:00 A.M. to 3:30 P.M. and 3:00 P.M. to 11:00 P.M. shifts, with a very small crew working from 11:00 P.M. to 7:00 A.M. Employees working the afternoon and night shifts received an additional pay differential, and weekend work is frequently required.

The sole means of public transportation to and from the Hospital has been, and still is the PAT Bus System, and it is inadequate. Service to the North Hills originates, from stops in the Downtown and Oakland sections of the City of Pittsburgh. Some of the routes from Pittsburgh to the Hospital require passengers to change buses at the Ross Division Garage. Commuting from most residential areas of the City and the rest of Allegheny County would require commuters to take at least two buses.[5]

The average travel time by public transportation on weekdays [6] from various areas to the Hospital is as follows:

operated a run on 11C which serves the Hospital on Sundays.

6. It is possible to reach the Hospital from originating points on the available bus routes in the City of Pittsburgh before starting time on the 7:00 and 8:00 A.M. shifts on weekdays, and to return by bus at the end of the shift. Before the Route 11C service was begun in November 1974, it was not possible to get to the Hospital before 7:00 A.M. on Saturday; it is now possible to arrive for the regular day shift on Saturday and to return at the end of that shift.

It is and has been possible to travel from Pittsburgh to the Hospital by public transportation in time for the 3:00 or 3:30 shifts, but it is and has not been possible to return by bus at the end of the shift on weekdays. On all available routes, both before and after November 1974, the last bus has departed the Hospital at approximately 10:40 P.M., before the end of the 3:00 to 11:00 shift.

One could also have arrived at the Hospital by PAT bus on time for the 3:00 to 11:00 afternoon shift on Saturday, but the last bus left the Hospital, both before and after institution of Route 11C, at approximately 9:00 P.M.

Public transportation is not and has not been adequate for any individual employed on the 3:00 to 11:00 afternoon shift, either on weekdays or Saturdays.

PAT bus service between Pittsburgh and the Hospital could be used by those employees

| From | During hours of: | Average Time |
|---|---|---|
| Hill District | 6:00 to 8:00 A.M. | 50 min. |
| | 2:30 to 3:30 P.M. | 45 min. |
| East Liberty | 6:00 to 8:00 A.M. | 85 min. |
| | 2:30 to 3:30 P.M. | 80 min. |
| Mt. Oliver | 6:00 to 8:00 A.M. | 95 min. |
| | 2:30 to 3:30 P.M. | 95 min. |
| East Hills | 5:30 to 8:00 A.M. | 95 min. |
| | 1:00 to 3:30 P.M. | 115 min. |

## F. THE LABOR MARKET

The EEOC contends the labor market from which the Hospital would hire most of its employees, if it did not follow a discriminatory policy, would be the Pittsburgh Standard Metropolitan Statistical Area (SMSA), which includes the Counties of Allegheny, Beaver, Washington and Westmoreland. The 1970 Census showed the total population of the SMSA was 2,333,500, of whom 164,987, or 7.1% were Black. In October of 1976, of the Hospital's 887 employees, 743, or 83.7% resided in the SMSA. In the 1970 Census, the civilian labor force in SMSA numbered 975,000 of whom 60,550, or 6.2% were Black.[7] We also refer to the Hospital Survey Report issued by the Pittsburgh Human Relations Commission which showed that hospitals in Pittsburgh employed 17,454 people in 1969, 4,025, or 23% of whom were Black. There were only two hospitals which employed less that 5% Black employees.

Dr. Lehoczky come to the conclusion that the SMSA data could not be used to conclude that the difference "has been caused by racial discrimination unless all other possible causes not related to racial discrimination have been removed as possibilities."

He added, "In this case, the geographical distribution of employees at NHPH [the Hospital] is not representative of the Pittsburgh SMSA, and this distribution is creating the appearance of racial discrimination." After looking at the Hospital's work force and the area from which they were drawn, he found that the Pittsburgh SMSA work force had a population radically different in racial composition. When one sees that Butler County was not included in the SMSA, although 16.4% of the Hospital's work force were residents of that area, and that Allegheny County, north of the Allegheny and Ohio Rivers (non-Pittsburgh), accounted for 11% of the SMSA, while the Hospital, because of its geographic location, drew 72% of its work force from this area, where the population is very heavily White, "[i]t follows that if [the Hospital] draws most of its work force from this region, then the work force would have been almost entirely white" and "the racial composition of [the Hospital] work force is likely caused by the racial composition of the surrounding geographical region rather than by racial discrimination in hiring." One needs to recall that of the Hospital's 881 employees, 560 live in or very near to the primary service area of the Hospital, where there are only .5% minority residents.

We can only conclude that the EEOC, without proper statistical analysis or factual basis, jumped to the conclusion that the number of Blacks employed by the Hospital was "nil", and the perceived deficiency was charged to race discrimination in hiring. The Hospital demonstrated by the weight of the credible evidence that the

assigned to the 11:00 to 7:00 night shift on weekdays, because buses arrived at the Hospital at approximately 10:00 P.M. before Route 11C service was started, and at 10:40 P.M. thereafter. Buses now return to Pittsburgh on a regular basis from about 6:00 A.M. on weekdays, and 7:00 A.M. on Saturdays. Before 11C began, buses to Pittsburgh on Saturday mornings began running about 8:00 A.M.

The last bus an employee working the 11:00 to 7:00 shift could take in order to get to the Hospital on time arrived at about 8:00 P.M., both before and after the 11C Route was added.

At no time has it been possible to arrive at the Hospital before 12:00 Noon or after 6:30 P.M. on Sundays, or to travel from the Hospital to Pittsburgh before approximately 1:00 P.M., or after 7:45 P.M. Public transportation has at no time been adequate for any employee working any of the three shifts on Sundays.

7. In the 1970 Census, the total hospital workers nationwide numbered 2,679,722, of whom 444,452 or 16% were Black. In Pennsylvania, of 118,112 hospital workers, 24,575 or 14% were Black. While the United States Census figures for 1970 do not show racial composition of hospital workers in Pittsburgh, the total health service workers in the SMSA were 55,073, of whom 6,685 or 12% were Black.

percentage of Black employed, while low, was explainable in terms of geography and applicant flow. Thus, no finding of race discrimination in hiring can be founded upon the record before this Court.

## G. INDIVIDUAL EXPERIENCES

The EEOC offered evidence to establish race discrimination in hiring through five job applicants.

### 1. *Elizabeth Tate*

Mrs. Tate, a Black woman, applied for employment as a housekeeper, listing previous experience at the Cadillac Hotel, Montefiore Hospital, and other places. She was interviewed on January 22, 1975, and told no opening existed at that time. She claimed that as she was getting coffee at a dispenser in the basement, she visited with a White woman who told her about just being hired as a housekeeper, and expressed surprise that Mrs. Tate had not been employed. The Hospital hired Kathleen Coyle, a White female, on March 18, 1975, but it was shown that no person was hired into the Housekeeping Department between January 1 and March 18, 1975, and no person who applied for employment on January 22nd was hired. Mrs. Tate lived at least an hour and a half commuting time from the Hospital, and it was admitted that she had quit a similar position with the Holiday House in Monroeville precisely because she had to get up too early to catch the bus to get to work. Yet, the Monroeville location was closer to her home than was the Hospital's North Hills location, both in travel time and in distance. Her sincerity in applying for the job is subject to serious doubt. We cannot find her testimony credible.

### 2. *Lester Smith*

■ Smith, a Black man, applied for employment as a housekeeper on April 7, 1977. On about May 9th, he had an interview with the Hospital's Director of the Central Supply Department, Leonard Tabb (a Black man). Smith recalled Tabb telling him there was a vacancy as a Central Supply Aide, that he found Smith qualified, and that he only needed a *pro forma* clearance by the Personnel Director. Tabb said he would call Smith after he got this clearance at his home that evening to confirm his employment. As directed, Smith then took his application to the Personnel Office where he was told he did not have the right transportation. Smith said Tabb phoned him that night and told him he lacked transportation and could not have the job. The Hospital filled the vacancy on May 27, 1977, when Mark Franz, a White man, was hired.

Tabb remembered the interview with Smith, and testified Smith had been late and offered bad bus connections as his excuse. He said he retained Smith's application after the interview and had never told Smith he had the job, for he was not favorably impressed. He said he told Smith he was one of several applicants and would be informed at a later time as to whether or not he had been selected.

Henry Yester, the Hospital's Director of Material Management, also remembered interviewing Smith briefly. Yester is Tabb's immediate superior and interviews all candidates for positions in departments under his control to familiarize himself with the applicants, and to learn their general qualifications. He estimated that he leaves about 90% of the hiring decisions up to the department supervisors, leaving himself only about 10% of the input in such decisions. Yester discussed the candidates for the particular position with Tabb, including Smith, and they both indicated Smith's probable transportation problems as a negative factor in evaluating his application. Thus, another of the candidates, Mark Franz, who lived only five minutes from the Hospital, was selected for appointment.

Lola Lindsay, Supervisor of the Housekeeping Department, testified she interviewed Smith on April 7, 1977 for about a half hour, and told him there was a vacancy on the 11:00 P.M. to 7:00 A.M. shift. She was impressed with Smith and said she offered him the job. However, after she explained the lack of bus service, Lindsay said Smith declined the job.

We do not find that Smith was not hired because of his race. There is no violation of Title VII in not hiring an applicant who does not have a reliable means of getting to the job, which was the reason we find for this rejection of the application not pressed by the applicant.

### 3. Franchot Carswell

Franchot Carswell is a Black male who telephoned the Hospital during the first week of December, 1977, to inquire about a job as a housekeeper, janitor, or kitchen helper, and who was asked to fill out an application form to be mailed to him. His application was received about December 8, 1977, and he did not indicate his race on the form, and he never went to the Hospital. He gave his age as 17, presently attending high school, and indicated he would continue to attend school for the next seven months. He applied only for full time employment and made no mention of any work study or work release programs for part time employment. In any event, the Hospital's failure to hire Carswell was not shown to have resulted from race discrimination, since they did not know his race.

### 4. Wallace Butler

■ Wallace Butler, a Black male, testified he saw an advertisement in the Pittsburgh Press and went to the Hospital on May 18, 1976, and filled out an application for employment as a Male Nurse Assistant or Orderly, stating he had previous Orderly experience. The Hospital's research indicates that no such advertisement or application existed. They hired a White Male Nurse Assistant on September 13, 1976, who had applied more recently (August 23, 1976), was a college graduate with a major in general science, and had previous work experience related to the Male Nurses Assistant position. Butler had not completed the ninth grade.

We cannot find that the Hospital discriminated against Wallace Butler because of his race.

### 5. Arthur Pope

Arthur Pope [8] is a Black man who went to the Job Placement Service of the Veteran's Administration seeking help in securing employment. The Hospital had listed a vacancy for a Storeroom Clerk early in 1972, and Mr. Russo of the V.A. told Pope about the vacancy on January 14, 1972. After Pope read the qualifications and seemed to meet them, Russo called the Hospital and arranged an interview for 4:00 P.M. that day. In order to reach the Hospital on time from Downtown Pittsburgh, Pope took a taxi cab. He was interviewed by Paul Warman, Storeroom Supervisor, and Pope told Warman about his storekeeper experience in the Navy, and indicated that he would come to work by car or bus. Mrs. Hough, the Personnel Director, asked Warman not to make a final decision on the vacancy until he had interviewed a David Hoagland, whom she had already interviewed, because he had indicated he could also operate a multilith machine. (They were looking not only for a Storeroom Clerk, but also for someone who could handle the multilith machine on a relief basis.) Warman interviewed six applicants, including Pope, even though Hoagland seemed to have the advantage, and after he interviewed Hoagland, Warman hired him. Warman testified that Pope did not live near enough to the Hospital to get there for disaster drills or emergencies although it was admitted that there never had been a disaster in the Hospital's history that required calling in off-duty employees. Warman also testified he was concerned about Pope's very abrupt manner, which he felt might interfere with his ability to deal with other Hospital personnel. He said such contacts are an important part of the job and, thus, when Hoagland appeared to be better qualified, he was hired. It appears that

8. At trial, the EEOC could not seek relief for Arthur Pope because the Court had previously granted the Hospital's Motion for Summary Judgment as to their claim for him due to the fact that Pope had released all of his claims in 1976 when he and the Hospital settled his private action, arising out of the same facts offered at this trial.

Hoagland did very little printing as the Storeroom Clerk because his other duties kept him fully occupied. Further, he proved not to be as skilled in printing as his application had indicated. He left the Hospital in October 1972 to enter the military service.

Later in 1972, a reorganization took place when Henry Yester was hired as the Director of Materials Management. The printing function remained the same, but the storeroom functions were transferred to Yester's control. Thus, no combination job existed thereafter to be filled. In October of 1972, when Hoagland left, the Hospital hired Gary O'Mahoney as the more recent applicant, and because he lived close to the Hospital. In September 1973, O'Mahoney left and Harvey Davison was transferred into the vacancy, since his capabilities were known to the Hospital. Here, again, race was not the determining factor.

### H. PROXIMITY PREFERENCE

It has been shown that enough of the White employees were transferred to the North Hills facility between 1964 and 1969 to result in 90% of the employees at the old facility being Black at the time of its closing. When the old facility closed, 75 Black employees left the employ of the Hospital. No offer of employment, with transportation provided, was extended to the Black employees at the old facility.

■ Instead, the EEOC contends that when the Hospital began recruiting employees, it announced a rule requiring a group of employees to reside within walking distance (an admittedly White area) or within 20 minutes travel time from the Hospital. The EEOC attempted to sustain a finding that such rules existed, not on direct evidence from its own witnesses, Drs. Smith and Christian, who denied it, but through argument based on the conclusion that geographic analysis of the work force supported the rule's existence—a long jump to a conclusion which this Court declines to make. They say 91% came from areas within a 20 minute driving time, no explanation was made concerning the 9% that did not.

Dr. John Lehoczky had this to say in his report:

"The applicants for employment over the period March, 1975 to September, 1977 were studied for their geographical distribution. This study was undertaken in an attempt to learn if the distribution of employees at NHPH was similar to the distribution of applicants for employment. If this were the case, then the observed distribution of employees (which is heavily weighted with residents of the Primary Service Area) could be explained by the applicant flow pattern rather than some hiring rule (a '20 minute rule' for example).

There was a total of 4171 applications for employment over this period. Of these applications 3107 or 74.5% came from residents in the Primary Service Area of NHPH while 25.5% came from outside this region. Of those with addresses outside the Primary Service Area, a large number live either outside Pennsylvania or in Pennsylvania, but beyond reasonable commuting distance (Erie, Harrisburg, Philadelphia, State College, for example). We must recognize that some of these individuals may be college students who have permanent residences within commuting distance of the Hospital, but it is impossible to tell. It is certain that the address given for each individual would not be the residence of this individual if he or she were to be employed by NHPH. Consequently these 179 applicants have been removed from the calculation.

\* \* \* \* \* \*

It appears from the applicant flow data very possible that the observed geographical distribution of NHPH employees has been caused by the geographical distribution of the applicants for employment with NHPH. About 78% of the applicants come from the Primary Service Area, thus a high percentage of employees will come from that area as well.

In summary, the applicant flow distribution shows that the applicants for em-

ployment at NHPH have a geographical distribution very similar to that of the employees at NHPH. These distributions are vastly different from the Pittsburgh SMSA. Consequently, the applicant flow data serves to underscore the very substantial geographic effect in this case."

We cannot find under the evidence offered here that there was the adoption of any rule which had the effect of discriminating against Blacks but rather, as was to be expected, the hiring would basically follow the applicant flow, which was less than 1% Black. Thus, the hiring was primarily related, said Dr. Lehoczky, to the geographic location of the Hospital with respect to areas of non-White population based on economic factors.

## II. DISCUSSION AND CONCLUSIONS

[5, 6] In this action, the EEOC seeks injunctive relief and back pay for Blacks as a class, on the basis of alleged racially discriminatory policies and practices by the Hospital. They must therefore initially establish by a preponderance of the evidence that a pattern of discrimination existed. Proof of isolated, accidental, or sporadic discriminatory acts is insufficient to meet this burden. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). The Plaintiff in such a suit may establish a *prima facie* violation of Title VII through statistical evidence and/or evidence of an employer's treatment of individual job applicants and employees. *Hazelwood School District v. United States*, 433 U.S. 299, 305, 97 S.Ct. 2736, 53 L.Ed.2d 768, 776 (1977); *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 400 (3d Cir.), *cert. denied* 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1976), *rehearing denied* 430 U.S. 911, 97 S.Ct. 1187, 51 L.Ed.2d 589 (1977); *Neely v. City of Grenada*, 438 F.Supp. 390, 406–7 (N.D.Miss.1977). In the instant case, the EEOC, as has been shown, has offered evidence under both methods which we must evaluate.

■ The EEOC first offered a comparison of the work force in the Pittsburgh Standard Metropolitan Statistical Areas

(SMSA) at 6.4% minorities, and the work force of the Hospital during the past six to seven years, at about 1%. The general value of such statistical comparisons was explained by the Supreme Court in *International Brotherhood of Teamsters v. United States, supra*, 431 U.S. at 340, n. 20, 97 S.Ct. at 1856:

"Statistics showing racial or ethnic imbalance are probative in a case such as this one only because such imbalance is often a telltale sign of purposeful discrimination; absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which the employees are hired. Evidence of long-lasting and gross disparity between the composition of a work force and that of the general population thus may be significant even though § 703(j) makes clear that Title VII imposes no requirement that a work force mirror the general population."

The usefulness of statistical data in assessing discriminatory practices depends, however, on the validity of the basic reference population as the pole star being compared to the work force of the employer. In *Hazelwood School District v. United States, supra*, the Supreme Court agreed with the Court of Appeals that the District Court erred in trying to decide whether a school district discriminated against Black applicants for teaching positions by comparing the percentage of Black teachers in the district to the percentage of Black pupils in the district. The proper comparison, the Court held, was between the racial composition of the Hazelwood teaching staff and the composition of the qualified public school teacher population in the relevant labor market. The evidence offered by the Hospital at trial clearly demonstrates that the Pittsburgh SMSA is not an appropriate reference population in this case.

We conclude, in accordance with the Hospital's expert witness, Dr. Lehoczky, that the Pittsburgh SMSA includes large geo-

graphical areas, containing a large population with a high percentage of minority group members, that contribute few employees to the Hospital. When White workers, who live in SMSA sections such as those communities to the south of Pittsburgh and the Monongahela and Ohio Rivers, and who presumably face no racial barriers to employment, are apparently unwilling to travel to the North Hills to work at the Hospital, it distorts reality to include these areas in the Hospital's relevant labor market. The EEOC argues that minority group members have historically suffered a higher than average rate of unemployment and have been relegated to less desirable and lower paying jobs, and are willing to travel longer distances and undergo greater inconvenience in order to obtain employment. Conceding this, however, the fact is that the percentage of applications received from the City of Pittsburgh and the area of Allegheny County south of the Monongahela and Ohio Rivers corresponds with the small percentage of employees from those areas at the Hospital, which contradicts the contention that a large or disproportionate number of minorities from these areas are willing to make the arduous trip and are applying for employment at the Hospital.[9] See *Timken Co. v. Vaughan*, 413 F.Supp. 1183 (N.D.Ohio 1976) (discussing commuting and the "immediate labor area" in regulations governing enforcement of Executive Order proscribing racial discrimination by government contractors). Out of the thousands of employment applications, the Hospital received only eight applications from Blacks. The fact that the SMSA does not include many areas that contribute a large percentage of the Hospital's employees, also makes it an inaccurate definition of the relevant labor market.

▪ Dr. Lehoczky's definition of the Hospital's relevant labor market avoided the EEOC's flawed approach by focusing on areas where Hospital employees reside. His study of the Hospital work force shows that the percentage of Blacks in those portions of its work force drawn from each of those areas, i. e. the North Hills, the City of Pittsburgh, and the rest of Allegheny County, corresponds closely to the percentage of Blacks in the total work force of those areas; the employees from the North Hills included two more Blacks than the percentages would indicate would be employed absent discrimination—a difference of plus .33%. It is true that 9.5% of the Hospital's employees coming from Pittsburgh are Black, compared to 18.1% of the total Pittsburgh work force, but this involves a difference of only four people. Considering the small number of persons involved in the Pittsburgh Area calculation (the presence or absence of one person makes a 2% difference), we do not think the difference makes out a prima facie case of a pattern and practice of racial discrimination.[10] We also note that, according to the expert testimony of Dr. Lehoczky, which we found uncontradicted, these differences between the "observed" and the "expected" minorities are readily explained by "random fluctuations", i. e. attributable to chance.[11] The EEOC

---

9. Evidence at trial indicated that residents of the East Liberty and East Hills Sections of Pittsburgh, which are far from the furthest points in the SMSA from the Hospital, who wished to travel by public transportation to the Hospital and return home, would have to spend about three hours on the bus.

10. Extreme caution is required when dealing with statistics derived from comparing a small "universe" with the general population. *Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974); *Harper v. Trans World Airlines, Inc.*, 525 F.2d 409 (8th Cir. 1975).

11. There is no requirement that the district court apply precise calculations of statistical significance in deciding whether the statistics establish a prima facie case. *Hazelwood School District v. United States*, 433 U.S. at 312, 97 S.Ct. at 2744, 53 L.Ed.2d at 780, n. 17; *United States v. Test*, 550 F.2d 577 (10th Cir. 1976), *cert. denied* 420 U.S. 28, 95 S.Ct. 749, 42 L.Ed.2d 786 (Colorado jury selection plan). But it is noteworthy that the "observed significance levels" relating to the differences between the percentages of Blacks in the work force for the three geographical areas in Dr. Lehoczky's study and the percentage of Black employees of the Hospital from those areas does not fall below .05. As Dr. Lehoczky stated in his report, "[T]he common statistical practice requires that an observed significance level be smaller than .05 before one can feel

did not introduce any expert testimony to refute Dr. Lehoczky's conclusions, and we accept them. *See EEOC v. Datapoint Corp.*, 570 F.2d 1264 (5th Cir. 1978).

We also note that the EEOC made no attempt to consider the education, experience, and skills required for the various positions at the Hospital by demonstrating the proportion of minority group members in the relevant labor market with the requisite qualifications to fill the positions. As the Court stated in *Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 620, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630, 644 (1974), "this is not a case in which it can be assumed that all citizens are fungible for purposes of determining whether members of a particular class have been unlawfully excluded." *Accord EEOC v. Chesapeake & Ohio Railway Co.*, 577 F.2d 229 (4th Cir. 1978); *Miller v. Weber*, 577 F.2d 75 (8th Cir. 1978).

■ The decline in the number of Black employees from approximately 40% to about 18% in 1964, and from 16% to 2% in 1969–70, cannot, standing alone, indicate discrimination. In the case *sub judice*, the changes resulted from the Hospital's initial move to the North Hills, which was necessary to preserve the Hospital, and the subsequent closing of the Convalescent Residence, which was deteriorating financially. When the Hospital moved to the North Hills, an employment preference was given to all of the present employees, White and Black; only one employee, a White female, was refused employment at the new facility. The fact that many Black employees did not make the move to the new location is attributable to their own personal choice. Although the Hospital did not offer the same blanket guarantee of employment to the employees at the Convalescent Residence when it closed, it did encourage all of them to apply for employment at North Hills, and none of those employees who applied for work at the North Hills facility was refused; the Hospital also made serious efforts to help those employees find other jobs. We conclude that the decline in the number of Black employees at the Hospital was not the result of racial discrimination.

■ The EEOC has also, as noted, offered evidence concerning five unsuccessful Black applicants for employment with the Hospital. We find, however, that none of these individuals was refused employment because of their race. Although the Hospital gave Arthur Pope serious consideration for the Storeroom Clerk position, the evidence is very persuasive that David Hoagland was chosen for the position in large part because of his printing training and because of the Supervisor's opinion that he seemed to be more cooperative than Pope and would be better able to deal with other personnel. Lester Smith applied and was interviewed for Hospital employment in April 1977, but was not hired because of transportation difficulties. One month later, the Hospital notified Smith that there was a vacancy as a Central Supply Assistant. The fact that the Hospital went out of its way to contact Smith to inform him of and consider him for an opening he was not even aware of belies the EEOC's charge that the Hospital's actions regarding Smith were racially motivated. Smith was not hired for either position because public transportation, on which Smith would have to rely, was not adequate, especially on weekends. Franchot Carswell, Wallace Butler and Tate, the three remaining applicants were never interviewed for any specific position at the Hospital.

In assessing these alleged cases of individual discrimination, we look to the standards set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817,

---

comfortable about rejecting the result as being caused by random fluctuations [*i. e.* by chance]."

At least one commentator has advocated the use of the .05 level in employment discrimination cases and pointed out that the EEOC has expressly adopted it as the standard for exam-

ining the job relatedness of a test used by an employer to screen employees. (29 C.F.R. § 1607.(c)(1) (1976). Hallock, The Numbers Game—The Use and Misuse of Statistics in Civil Rights Litigation, 23 Vill.L.R. 5, at 12–13 (1977–78).

1824, 36 L.Ed.2d 668, 677 (1973), for proof of a prima facie case. The Court there found that a prima facie case of illegal discrimination is established by a showing:

> "(i) that [an individual] belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applications; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications."

We have found that when Carswell, Butler, and Tate applied for employment, no positions were open, and, even assuming that all three were qualified, the EEOC failed to show that the Hospital deliberately passed over a qualified Black applicant for a vacant position and continued the search for a new employee so as to raise an inference of discrimination. Carswell submitted his application, undesignated as to race, by mail, so that the Hospital was not shown to have been aware of his race. As to Butler and Tate, the Hospital looked to the more recent applications when vacancies for a Male Nurses' Assistant and Housekeepers occurred. Under its usual hiring procedures, the Hospital looked first to the most recent applications because those applicants were more likely to still be available; a practice unrelated to race. In light of all the evidence presented, we find none of these individual applicants to have been rejected because of race.

The evidence concerning William Johnson, an employee of the Hospital allegedly discriminated against because of his race in shift assignments, proves only that there was a misunderstanding between the Personnel Office employees and Johnson concerning which shift he wanted to be assigned to. When they learned he wanted to work the day shift, they immediately offered him a position on that shift, and their offer was refused.

Finally, we consider whether any of the Hospital's employment practices, although facially neutral, resulted in a significantly discriminatory pattern of employment. In *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), the Supreme Court held that the female plaintiff, whose application for employment as a prison guard was rejected because she did not meet the height and weight requirements, established a prima facie case of illegal employment discrimination by showing that, based on national height and weight statistics, over 40% of all females, but less than 1% of all males, would be excluded by the standards. The showing that employment standards were discriminatory in effect shifted the burden to the employer to demonstrate they had a "manifest relationship" to the employment in question. The Court in *Dothard v. Rawlinson, supra,* concluded there was not sufficient evidence correlating height and weight with strength to support a finding that the requirement was job related and to rebut the plaintiff's prima facie case.

Here, the EEOC maintained that a Hospital policy required hiring only persons who were within "20 minutes" of the Hospital. No direct evidence was offered to support this contention.[12] Alexander McAliley, the Hospital's Executive Director, testified that, all other factors being equal, he would prefer an applicant living near the Hospital to one who lived far away, but "there has never been a requirement that employees live in any particular place." He said he had not discussed his preference with department heads, and had never made it a requirement. Virginia Lang testified that when she was Directress of Nurses, certain operating room personnel had to be available within 20 minutes for those nights they were on call in case there was a need for emergency surgery, but that there was no requirement that they live within 20 minutes of the Hospital. There was no evidence that any Black nurse was rejected for employment because of this requirement, or that it had an adverse impact on the em-

---

**12.** The EEOC itself appears to have altered its position since trial and now argues that the "20 minute" rule was a pretext used by the Hospital to conceal that its true motive in not hiring Blacks was a conscious policy of racial discrimination.

ployment of Black nurses. In addition, the requirement that operating room nurses be available for emergency surgery is, in our view, business related.

Donald Dickerson, an EEOC paralegal employee who lives in New Jersey, testified that he prepared a map by drawing a circle around the Hospital with a radius equivalent to the distance between the town of Zelienople and the Hospital, and found that the addresses of 91% of the employees at the Hospital had zip codes from areas within that circle. From this, the EEOC argues the "20 minutes" requirement policy.[13] A more logical conclusion, we feel, is that there is a natural and common desire of people to live near the place of employment, and to seek employment near their homes. Dr. Lehoczky's study of the applications received by the Hospital reveals that the percentage of employees from the North Hills, the City of Pittsburgh, and other areas of Allegheny County south of the Monongahela and Ohio Rivers, closely parallels the percentage of applications received from those areas, demonstrating the Hospital had no policy of excluding applicants who did not live close to the Hospital.

■ Counsel for the EEOC implied at several points during the trial that the Hospital had a policy against hiring individuals who did not own cars and had to rely on public transportation. Such a policy, because of housing patterns and economic fac-

tors, might be particularly burdensome to minorities. We conclude from all of the evidence, however, and especially from the testimony of Alexander McAliley and Lola Lindsay, that the Hospital had no such blanket policy. The EEOC managed to prove only that the Hospital required their employees to have transportation available to them that would enable them to arrive at work on time, and allow them to work to the end of their assigned shifts, an employment practice that the Court believes is business related.[14]

### III. ATTORNEY FEES

■ The Hospital characterizes this action as meritless, unreasonable, frivolous, and without foundation, and asks this Court to award it attorney fees, costs, and expenses. A defendant in a Title VII action can be awarded attorney fees under Section 706(k) of the Act, 42 U.S.C. § 2000e–5(k), which allows the district court to grant the "prevailing party" in an action under Title VII a "reasonable attorney's fee." The Supreme Court has stated that an award to a prevailing defendant is appropriate "upon a finding that the plaintiff's action was frivolous, unreasonable or without foundation, even though not brought in subjective bad faith." *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 98 S.Ct. 694, 700, 54 L.Ed.2d 648, 657 (1978).

The EEOC in the instant action introduced little evidence of discriminatory poli-

---

**13.** At one point, according to Dickerson, he drove to the Hospital from a point on the perimeter of the circle, and it took him 22 minutes. But Dickerson did not take into account the effect that traffic patterns, or road and weather conditions would have on the commuting time to and from the various towns and areas inside and outside the "20 minute" circle. In addition, his use of the distance between Zelienople and the Hospital as the measure of 20 minutes driving time was based only on what he was told by a Zelienople resident and was never verified. Most important, the fact that most Hospital employees live near the Hospital does not necessarily prove that the Hospital has a conscious policy of hiring only persons who live nearby the Hospital.

**14.** The Court received into evidence Plaintiff's Exhibit HHHHHH, a summary of EEO–1 Reports from various hospitals in the Pittsburgh SMSA. Next to the name of each hospital, the

exhibit lists the number of its employees and the number and percentage of Black employees at the hospital. The Defendant argues that consideration of this data is impermissible under Section 709(e) of Title VII, 42 U.S.C. § 2000e–8(e), which forbids public disclosure of information contained in these reports prior to the institution of any proceeding involving such information. Resolution of this legal issue, however, is unnecessary, because we find that the information is not relevant to the issues in this case. No evidence was introduced concerning the location of the hospitals listed in Exhibit HHHHHH, the labor market from which they draw their employees, or the availability of public transportation to the hospitals. Therefore, a comparison of North Hills Passavant with these hospitals sheds no light on the question of whether it engaged in discriminatory employment practices.

cies. Although the EEOC never employed a statistical expert to analyze the available data concerning minority hiring and employment, *see EEOC v. Datapoint Corp.*, 457 F.Supp. 62 (W.D.Texas 1978). We understand the EEOC's initial concern with the Hospital's situation in light of the drop in the number of minority employees, and investigation of the Hospital's history as well as a study of available statistics did not necessarily give explanations for the decline.

We follow the Supreme Court's admonition in *Christiansburg Garment Co. v. EEOC, supra*, 434 U.S. at 421, 98 S.Ct. at 700, 54 L.Ed.2d at 657, that "a district court resist the understandable temptation to engage in post-hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation," and we find that the EEOC's actions were reasonable.

Therefore, as part of its final order, we will deny an award of costs and attorney's fees to the Hospital.