570 F.2d 1264
 17 Fair Empl.Prac.Cas. 281, 16 Empl. Prac.
Dec. P 8225
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION and Helen Sierra,
Plaintiffs- Appellants,
v.
DATAPOINT CORPORATION (formerly doing business as Computer
Terminal Corporation), Defendant-Appellee.
 No. 76-2862.
 United States Court of Appeals,
Fifth Circuit.
 April 7, 1978.
Rehearing and Rehearing En Banc Denied May 17, 1978.
 
 1
 Abner W. Sibal, Gen. Counsel, James P. Scanlan, Atty., Beatrice Rosenberg, Atty., Joseph T. Eddins, Assoc. Gen. Counsel, E. E. O. C., Washington, D. C., for plaintiff-appellant.
 
 
 2
 Luis M. Segura, Al Kauffman, Attys., M. A. L. D. E. F., San Antonio, Tex., for H. Sierra.
 
 
 3
 Douglas S. McDowell, Robert E. Williams, Avrum M. Goldberg, William R. Weissman, Washington, D. C., for amicus curiae, Equal Employment Advisory Council.
 
 
 4
 John McCamish, Jr., George P. Parker, Jr., Charles J. Fitzpatrick, San Antonio, Tex., for defendant-appellee.
 
 
 5
 Appeals from the United States District Court for the Western District of Texas.
 
 
 6
 Before GOLDBERG and MORGAN, Circuit Judges, and SCHWARTZ,* District Judge.
 
 
 7
 CHARLES SCHWARTZ, District Judge.
 
 FACTS AND ISSUES
 
 8
 This appeal arises out of two consolidated lawsuits. One, filed by plaintiff Equal Employment Opportunity Commission (E.E.O.C.), charges that defendant Datapoint Corporation discriminated in the hiring of minorities into the job categories of officials and managers, professionals, technicians, office and clerical, and operatives, all in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e et seq.[1] Said proceeding was consolidated for trial with a claim by a private plaintiff, Helen Sierra, a former employee of Datapoint, against her former employer charging discrimination in her firing because of her national origin (Mexican-American), in the paying of "Anglo" employees higher wages than Spanish surnamed employees for the same type of work, in promoting "Anglo" employees before promotions were granted to Spanish surnamed employees, and in hiring such employees only when Anglo-Americans were not available. In connection with the E.E.O.C. proceeding, the trial court made a finding that none of the defendant's employment practices in any way discriminated against minorities or females. It awarded attorney's fees and other costs against the Commission. The Court held that the Commission adequately represented all past and present black, Mexican-American and female employees and applicants for employment with defendant. It further held that all such persons had received the best notice practicable of this action and that such persons from the beginning of the trial (March 16, 1976) would be bound by the judgment with the exception of one person who filed notice with the court that she did not wish to be so bound. The trial judge further found that plaintiff Sierra was not in any way discriminated against, denied relief, and awarded attorney's fees and other costs to defendant.
 
 
 9
 The issues presented by this appeal are whether the trial court erred by: (1) Finding that the defendant's employment practices were non-discriminatory; (2) certifying the E.E.O.C. as the Rule 23 representative of all past and present employees of Datapoint, thus binding the class to the judgment in this case; (3) finding that plaintiff Sierra was lawfully discharged for misconduct; (4) awarding attorney's fees against both Sierra and the E.E.O.C.
 
 
 10
 The claim of appellants results from the circumstances surrounding defendant's discharge of plaintiff Sierra from employment on December 16, 1970. Defendant Datapoint Corporation (organized in 1968) is a manufacturer of computers and computer software. This industry operates in a highly competitive market dominated by IBM. The company despite its present success and growth was almost bankrupt in 1971, and operated at a loss until 1973. It employed the following number of persons on the dates hereinafter set out: June, 1970 241; April, 1971 310; April 27, 1974 929; May, 1975 1202. Sierra, a Mexican-American citizen of the United States, was originally employed by Datapoint on October 6, 1969. Prior to that time she spent five years working for Zenith Radio Corporation. During her employment, Sierra always received good job appraisals. On December 15, 1970, the defendant was conducting employee reviews. Each employee was to report to the supervisor's office to discuss the review and to be advised of the amount of any raise such employee was to receive. Each employee was to return to work after the interview while another party would report for an interview. There was in existence a company rule against employees discussing the amount of their wages with one another. Sierra had her interview at approximately 2:00 P.M. and thereafter voiced dissatisfaction with the amount of her raise to her fellow employee. Sierra admitted indicating displeasure with the result of her interview and raise, but alleged that she and another dissatisfied employee returned to their work and completed their work shift. Defendant Datapoint's version of the events following the interview was quite different. Defendant claimed that not only did plaintiff Sierra leave her production line but also that she went to other lines where she began complaining to other employees, distracting them from their work and bringing production to a complete halt in at least two different areas of the plant.
 
 
 11
 On the following day Sierra was notified of her discharge based upon the following grounds: (1) Interfering with production; (2) interfering with the production of others; (3) creating dissension among fellow employees; (4) stopping other employees from working. Prior to her discharge, Sierra had received no notice of dissatisfaction with her work or any warnings from defendant.
 
 
 12
 Sierra initiated her litigation against defendant on December 15, 1970. It was a class action on behalf of herself and all of Datapoint's past and present Mexican-American employees and future applicants for employment. After extensive discovery Datapoint moved on December 17, 1973 to dismiss the class action which motion was granted on March 4, 1974. No appeal was taken from this order. On April 24, 1974, with full knowledge of the foregoing, the E.E.O.C. filed its independent suit against Datapoint charging the across the board discrimination as previously noted. Thereafter, the E.E.O.C. engaged in extensive pre-trial discovery which was burdensome and expensive for defendant.
 
 
 13
 On May 28, 1975 the E.E.O.C. filed a "Motion to Define Nature and Scope of Commission Suit" which was granted in an order certifying the E.E.O.C. as a representative of all past and present blacks, Spanish surnamed and female employees, applicants for employment and dischargees of defendant. It further provided for notice in accordance with Federal Rule of Civil Procedure 23(c). At no time prior to trial did the E.E.O.C., by motion or otherwise, seek to be relieved of its obligation to represent all of the foregoing groups of individuals, nor did it maintain until the instant appeal, that such individuals would not be bound by the judgment. Notice of the suit was given to persons who might have derived individual monetary benefit from a judgment in favor of the E.E.O.C. The notice included the option not to be represented by the E.E.O.C., and one person elected to avail herself of the opportunity to opt out.
 
 
 14
 The court specifically found that the E.E.O.C. was an adequate representative of the class and that all affected parties were given the best notice practicable and the opportunity not to be represented by the E.E.O.C. Thus, at the time of trial, the E.E.O.C. seemed to be seeking back pay, and perhaps other monetary relief, for that very class of persons which it now claims are not bound by the judgment of the trial court.
 
 
 15
 The E.E.O.C. at the trial limited its proof of a prima facie case to employment statistics consisting of a comparison of Datapoint's work force composition by job category with the minority and female composition of Bexar (San Antonio) and Guadalupe County work forces during the years 1970, 1971 and 1973.[2] The E.E.O.C. presented no other testimony concerning discriminatory employment practices. Prior to commencement of the trial, Sierra gave notice that she would rely on the E.E.O.C.'s evidence on discrimination.
 
 
 16
 Defendant introduced evidence which showed that it initiated an affirmative action program in 1973 which was approved by the Defense Supply Agency of the United States; that it made extensive minority recruitment efforts in the community, including expensive advertising programs; that it participated in community minority oriented programs sponsored by the Urban Coalition, EODC, and CEP; and that its minority employee percentage had been increasing approximately 3% Per year as the result of such efforts.[3]
 
 THE CLASS ACTION ISSUE
 
 17
 It is appropriate in the first instance to determine whether the class which plaintiff E.E.O.C. sought to represent is bound by the judgment rendered herein, the question being applicable only to the appeal of the E.E.O.C.
 
 
 18
 In Equal Employment Opportunity Commission v. D. H. Holmes, Ltd., 556 F.2d 787 (5th Cir. 1977) it was held that when the E.E.O.C. brings a suit in the nature of a class action, it may be required to comply with F.R.C.P. 23 and could be found to be an adequate representative of a class. While it is rather difficult, if not impossible, to conceive of a discrimination case seriously prosecuted by the E.E.O.C. in which it would not be found to be an adequate class representative, the fact is that in the instant case the trial judge specifically found the E.E.O.C. to be an adequate representative of the class and the E.E.O.C. went forward with the cause after being so designated. Now, on appeal, the E.E.O.C. takes the position that, although members of the defined class would have enjoyed the benefits of back pay and a permanent injunction against Datapoint had the E.E.O.C. succeeded in its suit, nevertheless these individuals should not be bound by a decision unfavorable to the E.E.O.C. Such a position is untenable. The conclusion urged by the E.E.O.C. would be both unjust and inequitable, as it could result in the necessity of litigation of multiple claims arising out of the same facts and presenting the same issues which could conceivably result in conflicting decisions in various forums and thereby wasting both the resources of the courts and the litigants.
 
 
 19
 Thus we hold that when the E.E.O.C. is denominated as the representative of a class, is held by the court to be an adequate representative, and proceeds as if it were representing a class, including the giving of notice to members of the class, the class sought to be represented is bound by the judgment rendered.
 
 THE E.E.O.C. CLAIM
 
 20
 In its judgment and findings of fact herein, the trial court made no determination as to whether or not plaintiff had established a prima facie case of discrimination, proof of which would require the defendant to assume the burden of rebuttal. However, in this case the failure of the trial court to expressly make such determination is not material as plaintiff's proof and defendant's rebuttal are completely interwoven. In this case the very statistics relied upon by plaintiff to establish a prima facie case formed the basis of defendant's rebuttal of it, i. e. that the statistics were not reliable. However, since we find that, considering the evidence as a whole, there was no discrimination, such distinctions are unnecessary for purposes of arriving at our decision.
 
 
 21
 We are mindful that a trial judge's findings "carry more of a badge of personal determination" when he does not solely rely upon proposed findings written by others; but when substantial evidence supports his findings they will not be found erroneous merely because the findings were adopted from a proposal by counsel. Louis Dreyfous & Cie. v. Panama Canal Co., 298 F.2d 733 (5th Cir. 1962).
 
 
 22
 We likewise take cognizance of the fact that findings of ultimate facts without a finding of the subsidiary facts upon which the conclusions rest is not subject to the clearly erroneous rule. Causey v. Ford Motor Co., 516 F.2d 416 (5th Cir., 1975). In this particular case we note that although the trial judge adopted some significant findings of fact prepared by defendant, insofar as the E.E.O.C. claim is concerned, the trial judge stated that he proceeded to "review all documents and other evidence duly and properly admitted at trial," and that he had "reviewed all of Defendant Datapoint's employment practices companywide, including but not limited to, its practices concerning recruiting, hiring, job assignments, promotions, transfers, treatment of disabled employees, wages, fringe benefits, reprimands, discharges, tests (as this term is defined by E.E.O.C. regulation) and all other terms and conditions of employment . . . "[4]
 
 
 23
 A review of the record in this matter demonstrates that there is more than sufficient evidence contained therein to support the trial judge's conclusions. Accordingly, such findings should be sustained as they are not clearly erroneous.
 
 
 24
 Isolating the categories of officials and managers and programmers, plaintiff's statistical evidence alone might be sufficient to infer discrimination in these job categories.[5] But, while statistics are an appropriate method of proving a prima facie case of racial discrimination, such statistics must be relevant, material and meaningful, and not segmented and particularized and fashioned to obtain a desired conclusion. Robinson v. City of Dallas, 514 F.2d 1271 (5th Cir., 1975); Taylor v. Safeway Stores, Inc., 524 F.2d 263 (10th Cir., 1975); Harper v. Transworld Airlines, Inc., 525 F.2d 409 (8th Cir., 1975).
 
 
 25
 In the instant case there is ample evidence to support the trial judge's conclusion that, in the first instance, plaintiff's evidence was not sufficient to support a prima facie case and secondly, that all of Datapoint's employment practices, including those relating to recruiting and hiring, were non-discriminatory. Dr. Bob Hill, an experienced and qualified statistician, recognized by the court as an expert, cast grave doubt upon the credibility of the E.E.O.C.'s statistics. In particular he testified that they were developed with a preconceived bias. In his opinion the statistics failed to provide a statistical analysis test so that the conclusions could be verified. According to Dr. Hill, the statistics incorrectly computed applicant flow data[6] and that they were computed with incorrect groupings, such as selective analysis of the job titles of programmers and test technicians, but not engineers and the selective exclusion of field applications in the exhibits in order to support the E.E.O.C.'s position. In summary, his general opinion was that the E.E.O.C.'s statistician's conclusions were not justified and were not evidence of good statistical methodology. The E.E.O.C. offered no testimony or other evidence in rebuttal of this position.[7]
 
 
 26
 However, even assuming that the statistics offered in evidence could in some categories be construed as demonstrating a substantial or gross disparity between the minority composition of the defendant's work force and the general population of workers available for hire or between minority hires and qualified minority applicants that would shift the burden of proof to defendant, and further assuming that the aforesaid testimony regarding the lack of credibility of plaintiff's statistics in itself was not sufficient to rebut the plaintiff's case, we hold that there was also ample evidence in the record for the trial judge to conclude that these disparities were not the result of purposeful discrimination. The record reveals that the company emgaged in expensive advertising programs to recruit minorities with particular efforts being made to locate and hire more qualified minority engineers as well as qualified minorities and females generally. It adopted an affirmative action program and met or exceeded its objectives, except in some minor respects for which there was reasonable explanation. It participated in community oriented race relation programs. Its employment practices which could be construed as a test were valid within the meaning of E.E.O.C. regulations. The company's business being in a highly competitive field, it was required to seek only qualified employees to avoid having to liquidate its business as it was nearly caused to do by financial problems in November, 1971. These recruiting problems are demonstrated by the fact that originally it had to recruit in the national market and had to hire employees as far away as Florida to get started, and that only 1.6% Of the nation's programmers are black or Mexican-American. Two of Datapoint's three initial interviewers of job applicants are minority as are 7 of 21 members of the personnel department; substantial numbers of minority employees have been promoted from operative to the craft category; from June 13, 1970 to May 28, 1970, the percentage of minorities in defendant's work force had been growing at approximately 3.06% Per year. In the categories of officials and managers, professionals, technicians, office and clerical, and operators, the minority growth percentage was statistically significant, based upon the percentage of such employees at the beginning of the period. See J. Johnston, Econometric Methods, McGraw-Hill Book Company, Second Edition, 1972, pages 24, 26, 27. The E.E.O.C.'s failure to pursue those claims of discrimination set out in footnote 1 infra by abandoning such on the date of trial after pursuing them for four years, is an indication that the company was not practicing discrimination in such areas. The fact that the E.E.O.C. did not present a single instance of racial discrimination other than the Sierra firing also leads to the conclusion that this company was not engaged in purposeful discrimination.[8]
 
 THE SIERRA CLAIM
 
 27
 In view of the conclusions that the company was not engaged in broad discriminatory practices, the appeal of the Sierra claim simply involves resolution of whether the facts indicate her discharge was racially motivated. Sierra's claim is primarily that she should have been warned or suspended for her conduct rather than discharged and that less severe discipline imposed against other employees demonstrates disparate measures in her case. However, even if action short of discharge was required by company policy, this in itself would not provide a nexus between national origin and her discharge. See Balderas v. La Casita Farms, Inc., 500 F.2d 195, 199 (5th Cir., 1974). In support of her contentions plaintiff Sierra testified and elicited testimony from three other witnesses. Defendant produced four witnesses who testified in person or by deposition to the effect that Sierra was discharged for her disruptive actions in stopping production and further that no other employee had ever engaged in this type of misconduct. The trial judge had the opportunity to observe the demeanor of plaintiff Sierra and the witnesses in support of her claim as well as the testimony and other evidence opposed to her contentions. Obviously, the trial judge did not give controlling weight or effect to plaintiff's testimony. There being ample evidence in the record to support such a conclusion, it should not be disturbed on appeal. In particular, while it appears that the evidence might show that perhaps plaintiff Sierra had a cause of action for wrongful discharge against Datapoint (which she did pursue and settle),[9] it does not appear there is sufficient evidence in the record to show that her discharge was motivated by reason of race or national origin.
 
 AWARD OF ATTORNEY'S FEES
 
 28
 Subsequent to the trial of this matter and argument of this appeal, the Supreme Court in Christiansburg Garment Company v. Equal Employment Opportunity Commission, --- U.S. ----, 98 S.Ct. 694, 54 L.Ed.2d 648 (January 23, 1978) delineated the guidelines to be applied to the award of attorney's fees to the defendant as a prevailing party in a Title VII action. While it is apparent to us that attorney's fees in this case might be due the defendant for being required to defend against that part of plaintiff E.E.O.C.'s claim which was dismissed by the E.E.O.C. on the morning of trial, no specific findings were made which would permit us to properly evaluate the attorney's fees awarded. Accordingly, we remand to the district court to make specific findings in accordance with the criteria of Christiansburg as to whether or not any part of the E.E.O.C.'s or plaintiff Sierra's claims were frivolous, unreasonable, or groundless, or pursued by plaintiffs after clearly becoming so, and to make any award of attorney's fees justified in light of such findings.
 
 
 29
 Accordingly, the judgment appealed from is affirmed in part and remanded for proceedings consistent with this opinion.
 
 
 
 *
 District Judge of the Eastern District of Louisiana, sitting by designation
 
 
 [1]
 The case as originally filed by the E.E.O.C. charged the defendant with across the board discrimination practices in addition to those set forth above and in particular the following:
 Limiting, segregating, and classifying black, female and Spanish-surnamed American employees and applicants for employment in such a way as to deprive them of employment opportunities because of their race, color, sex, and national origin, including, but not limited to entry-level jobs, transfers and promotions.
 Discriminating against blacks, women, and Spanish-surnamed Americans in respect to compensation, terms, conditions, and privileges of employment because of their race, color, sex, and national origin.
 However, on the date trial commenced, and without any prior notice, plaintiff E.E.O.C. for the first time since suit had been commenced, declared it was abandoning its claim as to the discriminatory promotion policy and its claim that defendant discriminated with respect to terms, conditions and privileges of employment. It further appears that it subsequently abandoned its original claim as to a failure to recruit and hire blacks and Spanish surnamed Americans into the job categories of sales workers and craftsmen and females into the job categories of sales workers (Page 6 of plaintiff E.E.O.C.'s brief).
 Also, prior to trial, defendant had at great expense employed experts to defend against E.E.O.C.'s originally stated position that "its tests were discriminatory." E.E.O.C. reaffirmed this contention as late as January 14-15, 1976, but as aforesaid, abandoned this allegation at trial.
 
 
 [2]
 The E.E.O.C. in support of its position called only four witnesses, Gus Gonzales, Chief of Conciliation for the Regional office, and a director of the San Antonio District Office; John Ford, Senior Research Analyst, Denver Regional Litigation Center, E.E.O.C.; Raymond Villarreal, Supervisor of Investigation for the E.E.O.C.; James Simonsen, Director of Industrial Relations of defendant Datapoint, as an adverse witness
 Plaintiff sought to prove its case by having witnesses Ford and Gonzales testify from eight exhibits setting forth various statistics and calling upon the Court to infer discriminatory practices as a result thereof.
 The testimony of witnesses Ford and Gonzales in essence consisted of reading from the eight exhibits. Witness Simonsen described defendant's employment practices but his testimony does not support plaintiff's contentions. Witness Villerreal's testimony simply elaborates relative to his conclusion that Sierra's discharge was racially motivated, because it was without a proper warning as given in other cases. However his report is somewhat contradictory and not wholly supportive of purposeful discrimination in that it finds none in many areas in which one would expect this to exist if the defendant was engaged in such practices.
 
 
 [3]
 Evidence was introduced which would tend to prove that Datapoint's geographical location and its not being accessible to public transportation placed it at a disadvantage as to recruiting certain minority groups
 
 
 [4]
 It is to be noted that the trial judge stated in his findings of fact that "all findings of fact herein may be considered conclusions of law if appropriate and vice versa."
 
 
 [5]
 A recapitulation of pertinent statistics offered to support the E.E.O.C.'s position follows:
 % of 1973 1973 1973 1973 1974 1974
 Minorities Area Co. Applica- Hires Applica- Hires
 nts nts
 Work Empl.
 Force
-------------------------------------------------------------------------------
 Position:
 Office and 40% 8.6% 25.5% 13.2% 22.6% 17.8%
 Clerical
* Operatives 50% 31% 59.3% 50.1% --- ---
**Officials 25% 4% 15.5% 2.9% 13.5% 3.3%
 and Managers
 Programmers 18.5% 2.8% 10% 4.9% 21.6% 5.4%
 (Stats. similar
 for "other profs.")
 Test 45.6% 22.2% --- --- 28.6% 15.5%
 Technicians
 *Operatives include line operators and inspectors.
**Officials and managers include department managers, supervisors, buyers
and middle level employees.
 
 
 [6]
 E.E.O.C. analyzes flow statistics for the years 1973-74 and concludes that such proved discrimination for the years 1971-1973. However, witness Simonsen stated that the flow statistics were kept without regard to any particular position. Also applicant flow data was not broken down to both applicants and hires in the field office and in San Antonio. Therefore, the flow data statistics have little probative value. See Robinson v. Union Carbide Corp., 538 F.2d 652 (5th Cir. 1976)
 
 
 [7]
 It is to be noted that John Ford, plaintiff's expert, was not tendered as an expert statistician or recognized by the court as such an expert. His computations are set out in his deposition which reflects that he has a master's degree in Industrial Psychology. From 1970 to March, 1975 he was employed as a testing expert for the state of Wisconsin, during which period of time he was also a lecturer for a personnel management course. His principal field of expertise up until his employment with E.E.O.C. on March 17, 1975 (one year prior to the date of this trial) appears to be in Psychology and in determining the validity of employment tests and interviews
 
 
 [8]
 Plaintiff E.E.O.C. cites the case of James v. Stockham Valves & Fittings Co., 559 F.2d 310 (5th Cir., 1977). This case is readily distinguishable from the instant situation as in that case there were gross statistical disparities coupled with a long history of other overt acts of discrimination
 
 
 [9]
 Sierra filed a claim with the Texas Unemployment Commission based upon the same discharge for which she seeks relief in these proceedings. In her unemployment compensation claim Sierra listed union activities as the reason for her discharge. The Texas Unemployment Commission specifically found that Sierra was discharged for misconduct connected with her job. See Salinas Valley Broadcasting Corp. v. N. L. R. B., 334 F.2d 604, 612 (9th Cir. 1964). She subsequently filed a charge with the N.L.R.B. which was settled with Datapoint by payment to her of $937.24