**EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,
Plaintiff,**

v.

**OLSON'S DAIRY QUEENS,
INC., Defendant.**

**Civ. A. No. H–86–3777.**

United States District Court,
S.D. Texas,
Houston Division.

July 12, 1991.

Rose Adewale–Mendes, Lauren M. Serper, John M. Williams, EEOC, Houston, Tex., for plaintiff.

David T. Lopez, David T. Lopez and Assoc., Houston, Tex., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HARMON, District Judge.

This action was brought by the Equal Employment Opportunity Commission ("EEOC") pursuant to section 706(f) of the Civil Rights Act of 1964, 42 U.S.C. section 2000e–5(f), on behalf of specifically named and other unnamed Black applicants for employment with Olson's Dairy Queens, Inc. ("Olson's"). The EEOC alleges that Olson's intentionally discriminated against Black applicants for employment. The action was tried to the Court without a jury.

## I. FINDINGS OF FACT

Olson's was incorporated on July 1, 1978, and operated three Dairy Queen locations serving ice cream, hamburgers and other food products. Steve Olson and his wife owned 100 percent of the stock of Olson's. At the time of trial, Olson's operated a total of nine restaurants in Texas: six in the Spring Branch area of Houston, two in Bellaire, and one in Katy.

On August 30, 1984, Christine Marie Williams, a Black employee of Olson's, filed a charge of racial discrimination with the EEOC. The charge alleged that, because of her race, Williams' manager hollered at her, failed to report a work-related injury, and refused to allow her to change shifts. Williams later amended her charge to include allegations that she had been bypassed for pay raises, and had been discharged on October 23, 1984, for habitual tardiness. At the time the charge was amended, the EEOC added a "class charge" asserting that Olson's illegally discriminated against Black applicants for employment on the basis of race. Upon investigation, the EEOC entered a finding of no reasonable cause to believe that any of Williams' individual complaints were true. However, the EEOC continued to act on its "class charge."

The EEOC investigator sought conciliation of the "class charge," recommending that Olson's pay $150,000.00 to 77 Black applicants who had not been hired by Olson's. On June 28, 1985, Olson's requested an opportunity to discuss the EEOC findings and to submit a written analysis prior to the issuance of a determination on the charge. On the same day, the EEOC issued its determination that there was reasonable cause to believe that Olson's was not hiring Black applicants because of their race. Additional attempts by the EEOC to seek conciliation failed and on July 17, 1985, the EEOC issued a notice of failure to conciliate. This action was commenced on September 30, 1986.

The would-be employees at issue had applied for entry-level positions as counter sales persons, responsible for meeting the public, preparing ice cream products, taking orders for food, operating the cash register, stocking and cleaning. Individual managers at the nine locations have full and independent authority to hire and fire employees in counter sales positions.

The managers receive only the general direction that persons hired be neat, clean, and friendly, and be literate enough to write down orders and operate the cash register. It was also important that the applicant be able to work the position and shift available. Within these guidelines, managers are free to use their own discretion and may use different specific criteria. For example, managers tended to favor those applicants who lived closest to the restaurants and who could be available on short notice. Neither Olson nor Watson ever directed any restaurant manager to hire or not hire a particular applicant or pool of applicants.

The managers are incumbent employees promoted to that position by either Mr. Olson himself or by one of the supervisors. The supervisors oversee an assigned group of restaurants and their managers. Unless the supervisors are substituting for an absent store manager, the supervisors do not hire persons for entry level positions.

Job vacancies for counter sales persons are announced either on a sign in the restaurant's window or in some instances, on the reader board in front of the restaurant where the vacancy exists. Each restaurant accepts its own applications which are ac-

cepted even if a position is not available. If the manager is not there when a person seeking employment completes an application, the employee on duty is authorized to accept the application on behalf of the manager.

Characteristic of the fast food industry, Olson's employee turnover rate is 300% or more per year. The evidence also established that most of Olson's employees are teenagers, working part-time for a short term, living in close proximity to one of the locations, and walking or riding a bicycle to work.

Applicants for employment at Olson's are requested to complete an application form, which does not identify the race of the applicant. If a manager has an immediate opening for a particular shift, the manager may hire the applicant upon completion of the application form and an interview. If there are no immediate openings, the application form is retained and the applicant may or may not be interviewed at a later date.

Since September 1984, if a manager decides to hire an applicant the applicant is given a Beta File test. The test is a commercially prepared survey that is designed to determine an index of job-worthiness based on attitudes and honesty. An applicant has the option of entering age, sex and race on the Beta file. The Beta File has been validated for purposes of equal employment considerations and applicants who identify themselves as other than Caucasian are awarded bonus points on the test. If an applicant passes the Beta File test, the last step in the hiring process is the administering of a "code test" in which the applicant is asked to memorize codes for the Dairy Queen products and their corresponding prices.

It is the burden of the EEOC to prove that Olson's engaged intentionally in discriminating against Blacks in its hiring of counter sales personnel. To prove this intentional unlawful discrimination on the basis of race, the EEOC offered statistical evidence and anecdotal testimony. Its statistical evidence was offered through the expert testimony of Dr. Mahlon Straszheim. The anecdotal testimony was offered primarily by Black individuals who had applied at Olson's and were not hired. In addition, one witness, a former manager, testified that an Olson's supervisor, John Watson, had told her to mark the applications of Blacks by tearing a corner and that he made the racial slur that he did not believe that Blacks should be hired.

Mr. Watson denied that he had given such an instruction and that he had made the racial slur attributed to him. He did testify, however, that he felt patrons were more comfortable in establishments being served by persons of their own race and culture. Mr. Watson testified that after the EEOC had indicated its dissatisfaction with Olson's racial mix he instructed managers to hire more Black employees.

Dr. Straszheim employed both a demographic method and an applicant flow method to statistically demonstrate Olson's discriminatory practices. The demographic method attempts to measure the balance of the employer's available labor market. The applicant flow method utilizes direct evidence of those actually interested in the job to determine balance in the employer's hiring decisions.

For the demographic method, Dr. Straszheim utilized the 1980 census figures for the category of food preparation and service worker to establish an availability rate of Black applicants for Olson's. In addition, Dr. Straszheim considered the area from which applicants would be available to extend more than 15 miles from each location. Dr. Straszheim also applied a weighing factor based on distance to determine the availability of Black employees in the area of each Olson's location.

Dr. Straszheim made no attempt to refine the applicant availability to reflect persons likely to be employed at fast food establishments. He acknowledged that his assumptions were not based on employees at establishments such as Wendy's and Burger King, but included persons who in 1980 were working for establishments such as Tony's Restaurant and the Ritz–Carlton.

Applying the availability to determine the anticipated number of Black hires and

comparing that number to the actual number of Blacks hired at Olson's, Dr. Straszheim opined that fewer Blacks were hired than anticipated and the discrepancy was so large as to make it unlikely that it was due to chance. He conceded that the census figure utilized corresponds to persons actually working in the food preparation and service industry in 1980.

With respect to the applicant flow analysis, Dr. Straszheim testified that he had examined applications for about 60% of the rejected applicants.

Dr. Chorush, testifying on behalf of Olson's, contended that the census figures for food preparation and service workers is not representative of the available applicants at Olson's because the actual experience of Olson's is that most persons willing to accept positions at Olson's are young, seeking part-time employment and residing within a very short distance of the restaurant. To corroborate his conclusions, Dr. Chorush presented area from which applicants would be available to extend more than 15 miles from each location. Dr. Straszheim also applied a weighing factor based on distance to determine the availability of Black employees in the area of each Olson's location.

Dr. Straszheim made no attempt to refine the applicant availability to reflect persons likely to be employed at fast food establishments. He acknowledged that his assumptions were not based on employees at establishments such as Wendy's and Burger King, but included persons who in 1980 were working for establishments such as Tony's Restaurant and the Ritz–Carlton.

Applying the availability to determine the anticipated number of Black hires and comparing that number to the actual number of Blacks hired at Olson's, Dr. Straszheim opined that fewer Blacks were hired than anticipated and the discrepancy was so large as to make it unlikely that it was due to chance. He conceded that the census figure utilized corresponds to persons

actually working in the food preparation and service industry in 1980.

With respect to the applicant flow analysis, Dr. Straszheim testified that he had examined applications for about 60% of the rejected applicants.

Dr. Chorush, testifying on behalf of Olson's, contended that the census figures for food preparation and service workers is not representative of the available applicants at Olson's because the actual experience of Olson's is that most persons willing to accept positions at Olson's are young, seeking part-time employment and residing within a very short distance of the restaurant. To corroborate his conclusions, Dr. Chorush presented figures prepared by Olson's reflecting the traveling distance and means of travel of current employees.

In addition, Dr. Chorush presented current student enrollment figures by race in the Spring Branch Independent School District for grades 10 through 12, and all grades for the years 1983 through 1989. It was Dr. Chorush's opinion that the boundaries of the school district present a reasonable area from which Olson's might expect to draw its predominantly teenage workforce for the six Spring Branch restaurants.

The Court finds Dr. Chorush's conclusions persuasive. The evidence demonstrates that persons likely to accept a position at Olson's live in the immediate vicinity and are willing to accept low-pay for part-time work. Applicants for employment are therefore likely to be substantially different from those actually holding employment in the food preparation and service classification. Dr. Straszheim's analysis, which included charts with circles drawn representing travel time from Olson's restaurants, and assumed Blacks would travel substantial distances to work at Olson's, is simply untenable.[1]

Dr. Straszheim admitted that each of the Olson's restaurants is located in a census tract that in 1980 contained fewer than 10

---

1. As one example, Dr. Straszheim assumed that Blacks living in Kashmere Gardens could and would travel 30 minutes for employment at an Olson's restaurant in Spring Branch. He admit-

ted that he had no actual knowledge of the travel time and could not dispute that an individual would take nearly two hours to make the trip by public transportation.

**1220**

percent Black residents. He also acknowledged that the closer the proximity to an Olson's location the fewer the Black residents. Dr. Straszheim's analysis shows, if anything, only that if Olson's had been hiring typical food preparation and service workers under conditions and at wages consistent with those generally paid those workers in 1980 he would have been expected to have more Black employees. It does not establish, however, that Olson's intentionally discriminated against Black individuals who were willing to accept the positions available. In short, the Court is unable to find that the statistics presented by Dr. Straszheim establish intentional discrimination on the basis of race by a preponderance of the evidence.

## II. CONCLUSIONS OF LAW

The Court has jurisdiction over the subject matter and parties to this action pursuant to 28 U.S.C. sections 1343 and 1345, 28 U.S.C. sections 2000e–5(f)(1) and (3). Venue is proper in the Southern District consistent with 28 U.S.C. section 1391, and 28 U.S.C. section 2000e–5(f)(3).

█ The Court has construed this as a pattern and practice lawsuit alleging disparate treatment of Black applicants for employment on the basis of race.[2] In this action the EEOC seeks injunctive relief and back pay for Blacks as a class, on the alleged racially discriminatory policies and practices of Olson's. In a disparate treatment case, motive must be proved and any alleged discrimination shown to be intentional. *Pouncy v. Prudential Insurance Co. of America*, 668 F.2d 795, 802 (5th Cir.1982). More has to be proved than the mere occurrence of isolated or accidental or sporadic discriminatory acts. *Id.* (citing *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977)). To prevail, a plaintiff must establish by a preponderance of the evidence that a pattern of intentional discrimination existed. In other words, racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice. *Id.* (citing *International Brotherhood of Teamsters v. United States*, 431 U.S. at 336, 97 S.Ct. at 1855).

█ The plaintiff in such a suit may establish a prima facie violation of Title VII through statistical evidence, evidence of an employer's treatment of individual job applicants and employees, or both. *Hazelwood School District v. United States*, 433 U.S. 299, 305, 97 S.Ct. 2736, 2740, 53 L.Ed.2d 768 (1977). In the instance case, the EEOC has offered evidence under both methods.

### A. Statistical Evidence

The EEOC first offered a comparison of the minority work force, defining the labor pool as the entire Houston Standard Metropolitan Statistical Area, and the minorities employed by Olson's. The general value of statistical comparisons was explained by the Supreme Court in *International Brotherhood of Teamsters v. United States:*

> Statistics showing racial or ethnic imbalance are probative in a case such as this one only because such imbalance is often a telltale sign of purposeful discrimination; absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which the employees are hired. Evidence of long-lasting and gross disparity between the composition of a work force and that of the general population thus may be significant even though § 703(j) makes clear that Title VII imposes no requirement that a work force mirror the general population.

431 U.S. at 340, 97 S.Ct. at 1857. The usefulness of statistical data in assessing discriminatory practices depends, however,

---

**2.** Although in a pattern and practice case a plaintiff may assert either a disparate treatment or a disparate impact theory, the EEOC in this action has not advanced a theory of disparate impact. The parties have agreed that this case is to be considered solely as a disparate treatment case.

on the validity of the basic reference population as the pole star being compared to the work force of the employer.

■■■ Statistical evidence is, of course, circumstantial evidence and like all circumstantial evidence it cannot be accepted uncritically. *Logan v. General Fireproofing Co.*, 521 F.2d 881, 883 (4th Cir.1971). The Court must give close scrutiny to the empirical proof on which a statistical model is premised. *Pettway v. American Cast Iron Co.*, 494 F.2d 211, 231 n. 44 (5th Cir.1974). In particular, the Court must guard against the use of data that has been segmented and particularized and fashioned to achieve a desired result. *EEOC v. Datapoint Corp.*, 570 F.2d 1264, 1269 (5th Cir.1978). In a disparate treatment case, the statistical evidence must be "finely tuned" to compare the employer's relevant workforce with the qualified populations in the relevant labor market. *Krodel v. Young*, 748 F.2d 701, 709 (D.C.Cir.1984).

■■■ In this case, the EEOC asks that the Court base the availability of applicants for a very specific type of food establishment on the basis of census figures for a broad category of food preparation and service workers, using as a reference population the entire Houston Standard Metropolitan Statistical Area. The evidence offered by Olson's demonstrates that the Houston SMSA is not an appropriate reference population in this case.

It is clear that the qualifications for employment at Olson's are minimal. That is, however, only one consideration in defining the qualified population. An equally important factor is the suitability of and interest in the position available. In this regard, the Court does not here deal with a traditional 8 to 5 job, but with a fast food establishment having peak hours of service and extended hours of operation, requiring many individuals to work for low wages in split and limited shifts, including nights, weekends and occasional holidays.

One commentator has recognized that in cases such as this the detailed census data is not appropriate and generally has been rejected:

One serious limitation of the census data is that they only reflect the number of persons employed or experienced and unemployed in a given job category as of the census date. Thus, some courts have rejected the use of detailed census statistics to show the availability of qualified applicants because such statistics indicate the number of individuals employed in the positions in question, rather than the number with the qualifications and interest to be employed in such positions.... The census does not purport to reflect the total number of persons who are experienced or qualified in a particular occupation.

Schlei & Grossman, *Employment Discrimination Law* at 1358 (2nd ed. 1983). The EEOC statistics define the labor pool as the entire Houston SMSA. For the jobs involved at Olson's, such a geographically defined market is much too broad, and the fact that weighing has been applied according to distances may ameliorate, but does not eliminate the problem.

The Houston SMSA includes large geographical areas, containing a population base with a high percentage of minority group members, that contribute few employees to Olson's. Use of such a large reference population ignores the proximal realities of the confined geographic area from which Olson's in fact draws its applicants and employees, and the economical realities of the distance an applicant is willing to travel to accept the positions available at Olson's. Therefore, the Court is unwilling to accept the EEOC's proffered statistical evidence to prove its prima facie case of discrimination. *See, e.g., Equal Employment Opportunity Commission v. North Hills Passavant Hospital*, 466 F.Supp. 783, 796 (W.D.Penn.1979); *Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974); *Harper v. Trans World Airlines, Inc.*, 525 F.2d 409 (8th Cir.1975); *Equal Employment Opportunity Commission v. Datapoint Corp.*, 570 F.2d 1264, 1269 (5th Cir.1978); *Krodel v. Young*, 748 F.2d 701, 709 (D.C.Cir.1984); *Soria v. Ozinga Brothers, Inc.*, 704 F.2d 990, 999 (7th Cir.1983).

## B. Anecdotal Testimony

The EEOC also offered testimonial evidence of unsuccessful Black applicants for employment with Olson's. The Court finds, however, that none of these individuals was refused employment because of her race. In all instances Olson's accepted the applications, and in most instances the applicants were interviewed.

In assessing cases of individual discrimination, the Court must apply the standard set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for proof of a prima facie case. The Supreme Court there held that a prima facie case of illegal discrimination a showing:

> (i) that [an individual] belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applications; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*Id.* at 802, 93 S.Ct. at 1824.

The anecdotal witnesses presented no more than their own perceptions of discrimination or, even more generally, of "not being treated right." Such subjective feelings, of course, do not establish discriminatory motive. Although in some cases the witness asserted a belief that a white applicant was hired, there was no identification of the white applicant, precluding any consideration of relative qualifications, time of application or other factors.

■ One applicant, Kathy Ann Ritchie, testified that she was looking for a full-time job as a cashier. There being no immediate openings for such position on a full-time basis, Ms. Ritchie was informed she would be contacted if a position became available. Another applicant, Angela Burks, completed several applications with different social security numbers and birth dates, and answered questions about on-the-job injuries by providing names of her friends. The rejection of her application

under such circumstances does not amount to a pretext, concealing a discriminatory motive basis on race. Other applicants generally applied for specific shifts for which there were no openings. In light of all of the evidence the Court finds that none of these individual applicants to have been rejected on the basis of her race.

■ The EEOC also offered the testimony of Ms. Zepeda, an employee of Olson's who testified that John Watson, vice-president and supervisor of Olson's, told her to mark applications by Blacks by tearing a corner and quoted Mr. Watson as stating that he did not believe Blacks should be hired. Mr. Watson denied making the statement that Blacks should not be hired. Although he did admit making notations on applications which indicated the race of the applicants, this practice began only after the EEOC began its investigation. The notations were regarded as favorable and were made with a conscious effort to hire more Blacks to satisfy the EEOC.[3]

Mr. Watson was not directly responsible for hiring sales counter personnel. The responsibility belonged to the individual managers. His testimony concerning the comfort level of patrons, while interesting, does not reveal any racial animus nor does it support the conclusion that Olson's systematically discriminated against hiring Black counter personnel. To the extent that Ms. Zepeda's testimony is inconsistent with Mr. Watson's the Court finds her testimony incredible and unsupportive of the EEOC's charges of illegal discrimination. To the contrary, Mr. Watson's uncontroverted testimony was that, of the employees he personally has hired for Olson's, when he was manager or acting manager, the majority was Black.

## C. Discriminatory Pattern of Employment

■ Finally, the Court will consider whether any of Olson's employment practices, although facially neutral, resulted in a significantly discriminatory pattern of employment. Although it is true that some of Olson's managers gave preference in

---

**3.** Dr. Straszheim's analysis confirmed that Olson's hiring of Black employees increased after the EEOC charge and investigation.

hiring to employees residing close to the restaurant location, this sporadic practice certainly does not rise to the level of systematic discrimination, nor was any evidence offered to support such a theory.

■ As a practical matter, more than one-half of Olson's employees are Black, Hispanic or Oriental. Olson's has had Black assistant managers and manager trainees and has had Hispanic and Oriental managers and assistant managers. Olson's has a decentralized hiring system in which full hiring authority is given to the managers, with no instruction to exclude Blacks or systematic directive that would discriminate on the basis of race. As a result Olson's has an ethnically diverse work force in which the employment of Blacks and other minorities has increased through the years with the changing demographic patterns in the areas immediately surrounding the locations.

The EEOC offered evidence that Olson's managers may have hired in accordance with their perception of the racial composition of their neighborhood, that Olson's managers may have given preference to applicants residing in close proximity and that the percentage of Black hires went up after the EEOC charge and investigation. While evidence of the first two practices may support, in a proper case, some inference of disparate impact, they are not material to this disparate treatment case. Considering the totality of the evidence it cannot be said that Olson's employment practices have resulted in a discriminatory pattern of employment.

The Court concludes that the EEOC has failed to bear its initial burden of establishing a prima facie case. The Court further finds that even if the statistical and anecdotal evidence were considered individually or in combination to raise an inference of discrimination, Olson's articulated nondiscriminatory reasons for its hiring. The asserted basis for Olson's hiring practices are reasonable under all the circumstances, and the EEOC has failed to show they are a pretext for a company wide practice of intentional discrimination. Moreover, the Court specifically finds that each of the restaurants involved operates independently with respect to hiring and that no intentional discrimination was proved as to any specific manager or location.

### D. Attorney Fees

■ Olson's has characterized this action as meritless, unreasonable, frivolous, and without foundation in fact or law, and seeks a recovery of its attorney fees, costs and expenses. A defendant in a Title VII action can be awarded attorney fees under Title 42 U.S.C. section 2000e–5(k), which allows the district court to grant the "prevailing party" a "reasonable attorney's fee." The Supreme Court has stated that an award to a prevailing defendant is appropriate "upon a finding that the plaintiff's action was frivolous, unreasonable or without foundation, even though not brought in subjective bad faith." *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978).

The Court is of the opinion that in this instance the EEOC continued to litigate this action after it became clear that the claim was unreasonable and groundless. Accordingly, Olson's may recover its attorney's fees as part of the costs, provided that it submits an itemized statement to the Court, properly verified and explained by affidavit of its counsel, within 10 days from the date of this Order. The EEOC may file its exceptions within 10 days of service.