IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 91-6027
_____


EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

                              Plaintiff-Appellant,
                              Cross-Appellee,

                    versus

OLSON'S DAIRY QUEENS, INC.,

                              Defendant-Appellee,
                              Cross-Appellant,

DAVID T. LOPEZ,

                              Appellee-Cross-Appellant.

_____

Appeal from the United States District Court for
            the Southern District of Texas
                  (CA H 86 3777)
_____
                  (March 9, 1993)

Before REAVLEY, KING and WIENER, Circuit Judges.

PER CURIAM:[1]

     The Equal Employment Opportunity Commission (EEOC) appeals

the district court's judgment that Olson's Dairy Queens, Inc.

(Olson's) had not committed unlawful employment discrimination

     [1] Local Rule 47.5 provides:  "The publication of opinions
that have no precedential value and merely decide particular
cases on the basis of well-settled principles of law imposes
needless expense on the public and burdens on the legal
profession."  Pursuant to that Rule, the court has determined
that this opinion should not be published.

and awarding Olson's attorney's fees.  We reverse and render as to Olson's liability and remand for determination of damages.

## I. BACKGROUND

The relevant facts underlying EEOC's complaint are outlined in the district court's opinion.  803 F. Supp. 1215, 1217-18. Our departure from the district court's recitation, and ultimately its opinion, is based largely upon the testimony of the EEOC's expert witness, Dr. Mahlon Straszheim, and Olson's expert witness, Dr. Ira Chorush.

A.   DR. STRASZHEIM'S STUDY.

Dr. Straszheim analyzed the extent to which Olson's actual hiring patterns produced a different black-nonblack employee mix than would be expected if Olson's hiring policies were entirely race-neutral.  He did so by two distinct means.

*1.   External Availability Analysis.*

The first approach, which was the focus of the district court's opinion, was to compare Olson's hiring history with the percentage of black food preparation and service workers in the relevant labor market from which Olson's draws its work force. Dr. Straszheim, relying on years of experience in labor, transportation, and urban economic analysis, determined that the relevant labor market was the metropolitan Houston area -- more specifically, the Houston Standard Metropolitan Statistical Area, or "SMSA," as defined by the United State Bureau of the Census.

Using detailed census data for the Houston SMSA, Dr. Straszheim determined that blacks comprise roughly 25.2% of the

2

food preparation and service workers in the Houston SMSA. By comparison, only 8.1% of employees of known race hired by Olson's between 1978 and 1987 were black.

Dr. Straszheim refined the Houston SMSA figures to account for travel time to and from Olson's locations and the average travel times for black food preparation and service workers reported in the census data. He also distinguished between the Spring Branch (6 locations), Bellaire (2 locations), and Katy (1 location) labor markets. Based upon the demographics of each of these distinct markets and the relevant travel times, Dr. Straszheim concluded that blacks comprised 19.8% of the relevant labor pool for Olson's Spring Branch and Bellaire locations, and 8.1% for the Katy store. By comparison, blacks comprised 6.5% of hires of known race at Olson's six Spring Branch stores, 12.3% of hires of known race at Olson's two Bellaire-area stores, and 9.4% of hires of known race at Olson's Katy location.

Employing standard statistical techniques, Dr. Straszheim concluded that there was less than one chance in 100,000 (.00001) that Olson's observed hiring patterns in the Spring Branch stores could have resulted from truly race-neutral hiring practices, and less than three chances in one thousand (.0026) that Olson's observed hiring patterns in the Bellaire stores could have resulted from truly race-neutral hiring practices. Dr. Straszheim found no statistically significant difference between the number of blacks hired in the Katy store

3

and the number which would be expected based upon black representation in the relevant labor market.

    2.    *Applicant Flow Analysis.*

As a separate and distinct means of assessing the race-neutrality of Olson's hiring practices, Dr. Straszheim compared the percentage of blacks among Olson's applicants of known race to the percentage of blacks among Olson's hired employees of known race. The results of this analysis were completely disregarded by the district court's opinion and largely ignored by Olson's own expert, as well as by Olson's counsel in his argument to this court.

Between 1984 and 1987, the period for which rejected applications were available, blacks constituted 29.6% of the roughly 1,800 applicants of known race. In the Spring Branch market, 30.1% of the applicants of known race for the relevant period were black; 39.5% in the Bellaire market; and 27.6% in the Katy market. By comparison, roughly 13.2% of the persons of known race hired by Olson's Spring Branch stores during the same time period were black, while blacks constituted 27.3% and 11.1% of the hires of known race for Olson's Bellaire and Katy locations, respectively, for the same period.

In light of the racial mix of actual applications made to each of the stores, Dr. Straszheim concluded that the likelihood that Olson's observed hiring patterns resulted from truly race-neutral hiring practices was less than one chance in ten thousand (.0001) for the Spring Branch stores, less than

seven chances in one thousand (.0070) for the Bellaire stores, and less than two chances in one thousand (.0020) in the Katy store.

B.    DR. CHORUSH'S STUDY.

Dr. Chorush testified that he had requested data from Olson's Spring Branch stores for April 1990. He found that, of the 60 employees working at the six Spring Branch locations in April 1990, more than one-half lived within one mile of the store at which they worked, and more than 80 percent lived within three miles. He testified that many of Olson's Spring Branch area employees were high school students and that many were employed part time. Dr. Chorush did not quarrel with Dr. Straszheim's depiction of Olson's Spring Branch area employees as predominantly nonblack. Based upon his observations, Dr. Chorush concluded that "most persons willing to accept positions at Olson's are young, seeking part-time employment and residing within a very short distance of the restaurant." *Id.*

## II. DISCUSSION

A.    EEOC'S COMPLAINT.

To prevail on its claim of disparate treatment, the EEOC must establish by a preponderance of the evidence that a pattern of intentional discrimination existed in Olson's hiring of black applicants. That is, the EEOC must show that racially discriminatory hiring was Olson's regular, rather than unusual, practice. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 360, 97 S. Ct. 1843, 1867 (1977)

5

("*Teamsters*").  If the EEOC establishes a prima facie violation, it is incumbent upon Olson's to articulate a legitimate, nondiscriminatory reason for its hiring patterns.  *Id.; McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973).  If Olson's articulates an acceptable rationale, the EEOC bears the burden of showing that Olson's explanation is a pretext for unlawful discrimination.  *Teamsters*, 431 U.S. at 362 n.50, 97 S. Ct. 1868 n.50; *McDonnell Douglas*, 411 U.S. at 804, 93 S. Ct. at 1825.

1.  *Prima Facie Violation.*

The EEOC may establish a prima facie violation of Title VII through statistical evidence, evidence of Olson's treatment of individual job applicants and employees, or both.  *See Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 97 S. Ct. 2736 (1977); *see also Pouncy v. Prudential Ins. Co.*, 668 F.2d 795, 802 (5th Cir. 1982) ("When the statistical showing is sufficiently strong in a disparate treatment action, the plaintiffs' prima facie case can be made without additional evidence establishing that the defendant purposefully treated minorities protected under Title VII less favorably than other persons.").  EEOC presented both statistical and anecdotal evidence.  While we do not dispute the district court's assessment of the anecdotal testimony of rejected applicants Kathy Richie, Angela Burks, Ruby Cantu, Lillie Lewis, and Jessica J. Jones, we hold that the district court erred both in its assessment of the statistical evidence offered by the EEOC and in

6

its conclusion that the EEOC failed to establish a prima facie violation of Title VII.

The district court correctly observes that "[t]he usefulness of statistical data in assessing discriminatory practices depends . . . on the validity of the basic reference population as the pole star being compared to the work force of the employer," 803 F. Supp. at 1220-21, and that, "[i]n a disparate treatment case, the statistical evidence must be `finely tuned' to compare the employer's relevant workforce with the qualified populations in the relevant labor market." *Id.* at 1221 (quoting *Krodel v. Young*, 748 F.2d 701, 709 (D.C. Cir. 1984)). However, we disagree with the district court's conclusion that the EEOC's statistical evidence fails to raise a claim of intentional discrimination. First, Dr. Straszheim's "external availability" methodology is sufficiently similar to that approved by the court in *United States v. Pasadena Indep. Sch. Dist.*, 43 Fair Emp. Prac. Cas. (BNA) 1319, 1987 WL 9919 (S.D. Tex. Apr. 18, 1987) (DeAnda, C.J.) ("*Pasadena I.S.D.*"), to beg the question why the court found it so lacking here.

Second, the travel times which the district court found "simply untenable," 803 F. Supp. at 1219, were confirmed by the census data, which was, in turn, legitimized by the actual applications received by Olson's. We do not understand how the district court can completely discount the possibility that prospective employees will travel further than a few blocks to work at Olson's when it was presented with evidence of hundreds

7

of applications from job seekers not residing in the immediate vicinity of an Olson's location.

Third, Dr. Chorush's analysis, which the district court found "persuasive," *id.*, is fundamentally unsound. Dr. Chorush's analysis considers only a portion of Olson's work force at only one point in time, presuming that what was true for the Spring Branch stores in April 1990 must be true for all Olson's locations over the entire period under dispute. Dr. Chorush begins with the presumption that one can describe Olson's labor market by describing Olson's work force; thus, he concludes, since most of Olson's Spring Branch employees are white teenagers living a short distance from the store, then white teenagers living a short distance from the store constitute Olson's available labor force. This is wholly at odds with the fundamental premise of employment discrimination law. In order to test for discriminatory hiring, we evaluate an employer's work force in terms of the available labor pool, not the other way around. The fact that Olson's April 1990 Spring Branch work force was predominantly white teenagers living close to the store does not mean that there were not qualified applicants who were not white teenagers living close to the store.

Finally, the district court's assessment of the EEOC's statistical evidence completely disregards the "applicant flow" analysis conducted by Dr. Straszheim. Dr. Chorush "opin[ed]" that Olson's could "expect" to draw its work force from a given area. *Id.* By contrast, Dr. Straszheim analyzed the *actual*

8

applications.  The district court found, based upon Dr. Chorush's testimony, that "[a]pplicants for employment [at Olson's] are therefore likely to be substantially different from those actually holding employment in the food preparation and service classification [of the Census]."  *Id.*  However, Olson's own applications indicate that blacks not living within the immediate vicinity of Olson's locations comprise a *higher* percentage of applicants than was suggested by Dr. Straszheim's census-based analysis.

Guided by this circuit's previous admonition that the "most direct route to proof of racial discrimination in hiring is proof of disparity between the percentage of blacks among those applying for a particular position and the percentage of blacks among those hired," *Hester v. Southern Ry.*, 497 F.2d 1374, 1379 (5th Cir. 1974), we conclude that the district court clearly erred when it held, without fully considering the "applicant flow" analysis offered by the EEOC's expert, that the EEOC had failed to provide ample statistical evidence to establish a prima facie violation of Title VII.[2]  To the contrary, we find the record replete with evidence to establish such a violation.

*2.    Olson's Rationale.*

The district court summarily accepted, without description or explanation, Olson's articulated nondiscriminatory

_____

[2]    We also express concern for the short shrift which the district court gave the EEOC's "external availability" analysis, especially when we consider the dearth of countervailing evidence offered by Olson's expert.

9

reasons for its hiring and found that the EEOC failed to show that those articulated reasons were a pretext disguising discrimination. 803 F. Supp. at 1223. We disagree with the district court's assessment of Olson's proffered explanation. The record clearly demonstrates that any explanation which the district court may have perceived to be facially nondiscriminatory is, in fact, mere pretext.

Discarding Mr. Watson's statement that Olson's customers prefer to be served by persons of their own "culture," the only other "reasons" which may be gleaned from Olson's case are (1) the proximity of an applicant's residence to the restaurant, and (2) the racial make-up of the Spring Branch school district. While the former might conceivably satisfy the *McDonnell Douglas-Teamsters* test if there was a showing that proximity to the restaurant was either a critical factor or even a stated criteria in Olson's hiring guidelines, that showing was not made or even attempted. This leaves only the intimation that people from nearby were hired because only people from nearby would apply. However, we know that is not true, based upon Dr. Straszheim's review of Olson's applications. As for the second explanation, the racial make-up of the Spring Branch school district explaining the racial make-up of the employees, aside from ignoring conditions at the Bellaire and Katy stores and in their surrounding neighborhoods, presumes that Olson's potential work force is composed of area high school students. However, while it may be true that Olson's *employees* are predominantly

10

area high school students, the applications make it clear that Olson's available *labor force* includes many persons who are not area high school students.

B.   OLSON'S ATTORNEY'S FEES.

42 U.S.C. § 2000e-5(k) allows the district court to grant the prevailing party in a Title VII action to recover reasonable attorney's fees.  Because we render judgment for the EEOC on liability, it is the EEOC who prevails and not Olson's. Notwithstanding that, we are compelled to express our puzzlement at how the district court could look at this record and find that the EEOC's complaint was "frivolous, unreasonable, or without foundation," *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421, 98 S. Ct. 694, 700 (1978), particularly in light of the district court's denial of Olson's two pre-trial motions for summary judgment and of Olson's Rule 41(b) motion for dismissal, which was offered at the close of the EEOC's case-in-chief.

### III. CONCLUSION

We REVERSE and RENDER judgment in favor of the EEOC on the question of Olson's liability.  We return this matter to the district court in order to proceed to the damages stage of this employment discrimination class action, *see Teamsters*, 431 U.S. at 361-62, 97 S. Ct. at 1867-68; *Richardson v. Byrd*, 709 F.2d 1016, 1021 (5th Cir. 1983).

REVERSED AND RENDERED IN PART; CAUSE REMANDED.

11